George John GESSNER, Appellant,

v.

**UNITED STATES of America,
Appellee.**

No. 8220.

United States Court of Appeals
Tenth Circuit.

Dec. 21, 1965.

Gerald L. Goodell and Ernest J. Rice, Topeka, Kan., for appellant.

Robert L. Keuch, Washington, D. C., (J. Walter Yeagley, Asst. Atty. Gen., Newell A. George, U. S. Atty., and Kevin T. Maroney, Atty., U. S. Dept. of Justice, on the brief), for appellee.

Before PICKETT, LEWIS and HILL, Circuit Judges.

DAVID T. LEWIS, Circuit Judge.

On December 6, 1960, appellant Gessner, then a private first class in the United States Army, went AWOL from his unit stationed at Fort Bliss, Texas, and remained absent without leave until his arrest by military authorities in Panama on March 22, 1961. He was subsequently tried by court martial for desertion, found guilty, and sentenced to a period of confinement at the United States Disciplinary Barracks, Fort Leavenworth, Kansas. Upon release from this confinement March 30, 1962, Gessner was arrested by civil authority subservient to an indictment charging in the first five counts that appellant had violated 42 U.S.C. § 2274 [1] by communicating with

---

1. This section provides in part: "Whoever, lawfully or unlawfully, having possession of, * * * any documents, * * * or information involving or incorporating Restricted Data—

(a) communicates, transmits, or discloses the same to any individual or person, * * * with intent to injure the United States or with intent to secure an advantage to any foreign na-

agents of Soviet Russia between December 9, 1960 and January 4, 1961, concerning five separate items of Restricted Data information relating to the internal construction, firing system, and elements of design and operation of designated nuclear weapons. He was found guilty by a jury on each of the five counts and, upon recommendation of the jury, sentenced to life imprisonment. We reverse the judgment and remand the case for a new trial, holding that appellant's confession was coerced as a matter of law and thus improperly considered by the jury.[2] Since we reach our conclusion from the totality of the circumstances and not from deprivation of a single or specific right, it is necessary to relate the history of appellant's offense and of subsequent events.

The appellant at the time of the charge security compromise was 24 years old and a member of the Ordnance Special Weapons Unit at Fort Bliss, Texas. He came to this unit from the Army Ordnance Nuclear Weapons School at Sandia Base, New Mexico where he had just completed an eighteen-week course qualifying him as a nuclear weapons maintenance specialist. As part of the Sandia course the appellant was instructed on the internal construction and firing system of the Mark VII nuclear weapon, and the design and operation of the 280-millimeter and 8-inch gun-type nuclear weapons—the information he eventually transmitted to the Russians. Previous to his Sandia schooling the appellant had received training in guided missile electronics as a member of the United States Air Force and had worked briefly as a civilian guided-missile electronics technician at Cape Canaveral (Kennedy), Florida.

The appellant was transferred to Fort Bliss in September 1960, and was as-

signed to an Ordnance Special Weapons Unit where he lived in the barracks with other enlisted men in the unit. He was considered intelligent and capable by his fellow enlisted men and superiors, and his service was apparently quite satisfactory until approximately November 1960 when his attitude began to change. Testimony given at the trial indicated that appellant became deeply interested in religion as a result of a visit to a local El Paso Unitarian Church and that such interest was followed by a deep aversion toward the preparations for war—particularly his association with weapons of mass destruction. On one occasion his concern for world war apparently caused him to relate a bizarre plan to his barracks mates whereby he intended to plant a nuclear weapon at the United Nations during Mr. Krushchev's visit and then threaten to destroy the building and the assembled world leaders unless they agreed to an international peace treaty.

The appellant also became disenchanted with Army discipline and his assignment to numerous menial tasks in the barracks and maintenance shop. His service and personal conduct rapidly deteriorated through drinking followed by hangovers, trips to sick call and the forging of sick slips to avoid duty. On December 2, 1960 he sought out the chaplain and expressed his trepidation in working with weapons of mass destruction and his desire for a transfer to a medical unit. On December 6 Gessner's commanding officer lodged court martial charges against him for forging sick slips. That evening he called his mother stating to her, "Mom, I can't take it any more. * * * I will not help them kill. * * * I got to get away."

Gessner left Fort Bliss that night, hitchhiked across the border to Juarez,

---

tion, upon conviction thereof, shall be punished by death or imprisonment for life (* * * upon recommendation of the jury), or by a fine of not more than $20,000 or imprisonment for not more than twenty years, or both; * * *."

2. Our determination of this issue makes it unnecessary to consider numerous related claims of error made by appellant. Such other contentions of appellant that are independent of the admissibility of the confession have been considered by the court and are found to be without merit.

Mexico and caught a bus to Mexico City. He took with him a small canvas bag containing five unclassified training manuals, a few clothes and personal items. The appellant arrived on December 9 in Mexico City and went the following morning to the Russian Embassy. He here used his unclassified training manuals and his Sandia diploma as certificates of introduction.[3]

The first meeting with the Russians was spent mainly in filling out application forms for a visa and political asylum, but for several days thereafter the appellant met with Russian representatives at various spots throughout the city and divulged the restricted data for which he was convicted. The appellant remained in Mexico City until December 22 when he traveled to Kingsville, Texas where he visited with his father. He returned to Mexico City approximately January 2, 1961. He re-established contact with the Soviet Embassy and further discussed security information with them until January 4 when the Russians indicated they could give Gessner no further help in acquiring a visa or otherwise assist him.

Subsequently, he visited the Czech, Polish and Cuban representatives in Mexico City attempting to secure a visa or other assistance but was unsuccessful; however, he eventually obtained visas for various Central American countries and as a result left Mexico City on January 14. Thereafter, he journeyed through Central America, spending several weeks with some missionaries in Costa Rica, and eventually reached Panama where he was arrested as a deserter by the United States military authority.

After his arrest on March 22, Gessner was kept in confinement at Panama for nearly seven days. He would not eat, move or speak. Carried bodily to a plane, he was flown to the United States and taken directly to the post stockade at Fort Hood, Texas. He remained mute but soon began communicating through written notes with the stockade chaplain and Dr. Roper, a psychiatrist.

Since it was known that Gessner had had access to secret Restricted Data, it was apparent to military authority that a security problem existed and a team of five commissioned and non-commissioned officers constituting a Counter Intelligence Corps interrogation team was immediately assigned to Fort Hood to "debrief" Gessner, that is, find out if any disclosure of United States security information had been made by appellant during his period of desertion. The interrogation team was headed by William Benson.

Benson, of course, was faced with the problem of Gessner's mutism. Observing that appellant's personal effects contained religious tracts and knowing that appellant was communicating with the chaplain by note, Benson sought that officer's cooperation in breaking Gessner's mutism and in persuading the prisoner to talk with Benson. Appellant continued communicating with the chaplain by note from March 29 through 31; on April 1, the chaplain told appellant that he would help him with his anticipated court martial for unauthorized absence, but that things were not going to be cleared up until appellant began speaking. At this point appellant said "Well, what's the use," and terminated his mutism. He agreed to talk to the C.I.C.

On Monday, April 3, the C.I.C. officers began their interrogation of the appellant in a military intelligence office containing a two-way mirror and concealed microphone both of which were connected to an adjacent room where Gessner could be observed and his statements recorded. The appellant was read Article 31 of the Uniform Code of Military Justice [4] and was generally informed that the officers wished to question him about his activities during his unauthorized absence. During this interrogation that

---

3. Gessner's activities in Mexico City and, in particular, his contacts with the Russians are according to Gessner's statements.

4. Article 31 states in pertinent part: "No person subject to this code may compel any person to incriminate himself

began on April 3 and continued irregularly until June 7, Gessner confessed to the substantive offense of violating the Atomic Energy Act and the specific details charged in the indictment.

The interrogation of Gessner was recorded[5] and has been transcribed. The transcription consists of thousands of pages. Testimony at the trial relating to appellant's statements composes most of the two thousand page trial record. The sheer bulk of such a record prevents a particularization of the questioning or even a comprehensive summation. However the appellate contentions of the parties necessitate reference to some particular incidents and to many continuing aspects of the interrogation. And we approach our consideration of the determinative issue in complete accord with the government's contention that the military interviewers treated Gessner with admirable decency. They also conducted the questioning with skill, patience and persistence and accomplished the comforting result of unveiling appellant's security compromise.

Counsel contend' that the confession was inadmissible as a matter of law because the undisputed evidence shows Gessner's mental condition such as to render him incapable of making a voluntary confession. Comprehensive medical evidence combined with lay observation of conduct (including a suicide attempt) was presented to both court and jury upon the question of Gessner's legal sanity and his ability to voluntarily confess. Opinion evidence extended from "legally insane" through "paranoid schizophrenia of long standing" to testimony that he was not suffering from a "major medical mental illness or from a

psychiatric condition of psychotic proportions" and the opinion that his conduct was under voluntary control. The issue of Gessner's legal capacity to commit the crime was submitted to the jury upon the trial court's careful and correct instructions in accord with Wion v. United States, 10 Cir., 325 F.2d 420, cert. denied, 377 U.S. 946, 84 S.Ct. 1354, 12 L.Ed.2d 309, and the evidence does not dictate a result of an involuntary confession as in Blackburn v. State of Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242. But surviving the ultimate fact of legal sanity and the ultimate legal fact of capacity to voluntarily confess is the undisputed simple fact that Gessner was beyond all doubt mentally ill,[6] a factor that must contribute heavily to the consideration of the legality of his confession viewed in total circumstance.

Pertinent to any inquiry into the voluntariness of a confession are the factors that explore the nature and technique of the interrogation. And here, again, we agree with the government that the evidence does not indicate that Gessner was in any way physically abused and that care was taken that sustained questioning did not result in complete exhaustion. But while these negatives support the overall moral decency of the questioning they lend little aid to the contention that the confession was not coerced. On the day that Gessner first admitted his compromise he was in the company of the C.I.C. team members from 8:30 a. m. until 9:00 p. m. At about 4:30 p. m., the chaplain indicated that he thought Gessner was tired. Benson agreed, and appellant was taken by Benson and the chaplain back to the stockade. Appellant indicated he would like to go into the stockade chapel with the chaplain and

---

or to answer any question &ast; &ast; &ast; which may tend to incriminate him.

No person subject to this code may interrogate or request any statement from, an accused &ast; &ast; &ast; without first informing him of the nature of the accusation and advising him &ast; &ast; &ast; that any statement made by him may be used as evidence against him in a trial by court-martial."

5. Gessner did not know that tapes were being made.

6. His condition persists. On June 5, 1962, after a hearing the court found Gessner incompetent to stand trial; on October 2, 1962, he was found competent and the case set; on May 29, 1963, he was again found incompetent; on April 20, 1964, he was found competent. Trial commenced May 26, 1964.

talk.[7] The conversation was of a religious nature during which Gessner was urged to cleanse his soul and come "clean with the Lord." The climax came when Gessner, in tears, blurted out, "I gave them all. I gave them all of it." Benson was invited immediately into the chapel and talked with appellant for about an hour, taping the conversation upon an undisclosed recorder. After dinner, Benson interrogated Gessner from 7:00 p. m. until 9:30 p. m. during which time much detail of the Mexico City events was revealed. Further detail was supplied at later interrogations, the total duration of which Benson set at over ninety hours of questioning with at least forty-five hours directly devoted to pertinent matters. The chaplain talked to appellant more than twenty, "probably less than fifty," times.

Appellant describes the technique of the interrogation as one of threat and promise permeated with an overwhelming religious influence exerted by the chaplain. The government counters with the claim that the questioning constituted permissible appeal to conscience and patriotism with religion being a natural subject for conversation within appellant's orbit of interest. We consider each position to be the extreme of advocacy. But, admittedly, the chaplain used his efforts to persuade Gessner to talk;[8] the interrogators directed their efforts to persuade Gessner to talk about the security compromise.[9] Although the subjective motivation of the chaplain perhaps differed from that of the C.I.C., the combined and cooperative efforts reached Gessner.

Extended argument is advanced by appellant contending the confession is totally inadmissible because of the application of Rule 5 of the Criminal Rules, and the compulsion of McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L. Ed. 819; Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479; and Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977. We find it unnecessary for our decision to determine the application of any of these accepted rules to interrogations conducted by the military for military purposes or the potential impact of the cases as an absolute bar in a nonmilitary prosecution. In the case at bar it suffices to note that Gessner was without counsel during the entire interrogation, was never advised of his civilian rights nor taken before a judicial officer until a year after his confession. Appellant was legally detained for military purposes and security dictated the necessity of obtaining information of his compromise with the Russians; to prosecute him under civilian law is an entirely different thing [10] and the usual safeguards to and indicia of voluntariness are simply absent under the circumstances.

As the Supreme Court in Culombe v. Connecticut, 367 U.S. 568, 601, 81 S.Ct. 1860, 1878, 6 L.Ed.2d 1037, stated, "No single litmus-paper test for constitutionally impermissible interroga-

7. Gessner believed he could tell the chaplain things that the chaplain could not in turn tell the C.I.C. Gessner so stated in his conversation with the C.I.C. team.

8. The chaplain testified:
"Q. Now, as a matter of truth and fact, isn't it true that your purpose there, and you had been asked there by Benson, to induce George to start confessing?
"A. Well, I would say, sir, I was asked to come there at his—at George's request, and if there was any way—he didn't ask me to get him to talk, but in my heart, if there was anything I could do to get the boy to come clean with his soul, if

he had something on his mind to get it off, this is true."

9. The government concedes the technique of the interrogators included a background of many "half-truths." The agents made reference to "maybe six months" for desertion; to Gessner's "return to Central America," etc.

10. Much of Gessner's confession involved detail of secret data which the government was unwilling to declassify for the prosecution, announcing it would dismiss if the trial court ruled it necessary to admit the entire transcription of the interrogation. The trial court correctly ruled that it was not necessary.

tion has been evolved \* \* \* Each \* \* \* [factor], \* \* \* the duration and conditions of detention \* \* \* the manifest attitude of the police toward him, his physical and mental state, the diverse pressures which sap or sustain his powers of resistance and self-control—is relevant. The ultimate test remains \* \* \* the test of voluntariness." Applying the ultimate test we conclude that the undisputed evidence negatives the existence of a question of fact concerning the voluntariness of Gessner's confession and compels a finding of legal coercion violating the Fifth Amendment. Appellant was mentally ill,[11] alone and without counsel,[12] uninformed of his rights as they pertain to this prosecution,[13] subjected to an extended and prolonged interrogation[14] by six interrogators[15] who used a technique of "half-truths" hinting lenience.[16] A confession obtained by unconstitutional means for intelligence purposes cannot subsequently be used with immunity in a civilian criminal prosecution.

"No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its (constitutional) provisions can be suspended during any \* \* \* exigencies of government" Ex parte Milligan, 71 U.S. (4 Wall.) 2, 119–121, 18 L.Ed. 281 (1886).

In remanding this case we are not unmindful that further prosecution under the Atomic Energy Act may not be possible although Gessner's betrayal of the United States is despicable, sorely testing the administration of justice as an individual case. Further, his statement to the trial court, when given the right of allocution at sentencing, is nauseating. This record reflects no travesty on justice. It does reflect complete fairness of prosecution and appeal upon the part of the government, careful and competent adjudication, and complete dedication of appointed defense counsel to a cause which, to them, as to us, is distasteful but reflects the legal profession at its best.

The case is remanded to the trial court with directions to grant a new trial.

11. Compare Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037; Blackburn v. State of Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242.

12. See Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977; Haynes v. State of Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513; Gallegos v. State of Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325; Culombe v. State of Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037; Spano v. People of State of New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265; Fikes v. State of Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246; Watts v. State of Indiana, 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801.

13. See also Culombe v. State of Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed. 2d 1037; Payne v. State of Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975; Watts v. State of Indiana, 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801; Harris v. State of South Carolina, 338 U.S. 68, 69 S.Ct. 1354, 93 L.Ed. 1815.

14. See Culombe v. State of Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037; Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948; Payne v. State of Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975; Fikes v. State of Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246; Turner v. Com. of Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810.

15. Compare Spano v. People of State of New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265; Watts v. State of Indiana, 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801; Turner v. Com. of Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810; Harris v. State of South Carolina, 338 U.S. 68, 69 S.Ct. 1354, 93 L.Ed. 1815.

16. Compare Lynumn v. State of Illinois, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922, and Payne v. State of Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 with Ashdown v. State of Utah, 357 U.S. 426, 78 S.Ct. 1354, 2 L.Ed.2d 1443.