## BLACKBURN $v.$ ALABAMA.

No. 50.   Argued December 10, 1959.—Decided January 11, 1960.

*Truman Hobbs* argued the cause and filed a brief for petitioner.

*Paul T. Gish, Jr.,* Assistant Attorney General of Alabama, argued the cause for respondent. With him on the brief was *MacDonald Gallion,* Attorney General of Alabama.

Mr. Chief Justice Warren delivered the opinion of the Court.

Jesse Blackburn was tried in the Circuit Court of Colbert County, Alabama, on a charge of robbery, found guilty, and sentenced to 20 years' imprisonment. By far the most damaging piece of evidence against him was his confession, which he persistently maintained had not been made voluntarily.[1] The record seemed to provide substantial support for this contention, and we granted certiorari because of a grave doubt whether the judgment could stand if measured against the mandate of the Fourteenth Amendment to the Constitution of the United States. 359 U. S. 1010. Plenary hearing has hardened this doubt into firm conviction: Jesse Blackburn has been deprived of his liberty without due process of law.

The crime with which Blackburn was charged was the robbery of a mobile store on April 19, 1948. By that date Blackburn, a 24-year-old Negro, had suffered a lengthy siege of mental illness. He had served in the armed forces during World War II, but had been discharged in 1944 as permanently disabled by a psychosis. He was thereupon placed in an institution and given medical treatment over extended periods until February

---

[1] The only other adverse evidence of any significance tended to prove that Blackburn and two others had traveled to Alabama from Illinois around the date of the robbery; that they were driving a maroon Buick; and that the crime was committed by persons who drove a maroon Buick with an Illinois license plate.

14, 1948, when he was released from a Veterans Administration hospital for a ten-day leave in the care of his sister. He failed to return to the hospital and consequently was discharged on May 24, 1948. The robbery of which he stands convicted occurred during this period of unauthorized absence from a mental ward. Blackburn's medical records further disclose that from 1946 he was classified by the Veterans Administration as 100 percent "incompetent" and that at the time of his discharge from the hospital both his diagnosis of "schizophrenic reaction, paranoid type" and his characterization as "incompetent" remained unchanged.

This does not by any means end the record of Blackburn's history of mental illness. He was arrested shortly following the robbery, and some time after his confession on May 8, 1948, the Sheriff reported to the circuit judge that Blackburn had exhibited symptoms. of insanity. The judge thereupon had Blackburn examined by three physicians, and after receiving their report he concluded that there was "reasonable ground to believe that the defendant was insane either at the time of the commission of [the] offense or at the present time." In accordance with the procedure prescribed by Alabama law,[2] the judge then directed the Superintendent of the Alabama State Hospitals to convene a lunacy commission. When the commission unanimously declared Blackburn insane, the judge committed him to the Alabama State Hospital for the mentally ill until he should be "restored to his right mind." [3] Blackburn escaped from the hospital once, only to be apprehended on another charge, declared insane

---

[2] Ala. Code, 1940, Tit. 15, § 425.

[3] We later set forth in detail the opinions of the members of this lunacy commission, Drs. Tarwater, Rowe, and Richards. As will appear, the evidence they supplied is of critical importance in this case.

by a second Alabama circuit judge, and sent back to the hospital. Before his return he was examined by another set of doctors who diagnosed his mental condition as "Schizophrenic, reaction, paranoid type" and declared that he was "Insane, incompetent, and should be placed in [an] insane hospital." Except for this brief interlude, Blackburn remained in the hospital for over four years, from July 1948 to October 1952, at which time he was declared mentally competent to stand trial.

At his trial, Blackburn entered pleas of not guilty and not guilty by reason of insanity. He testified that he could remember nothing about the alleged crime, the circumstances surrounding it, his arrest, his confession, his commitment to the State Hospital, or the early period of his treatment there. He denied the truth of the confession, but admitted that the signature on it appeared to be his. According to a 1944 Army medical report, one aspect of Blackburn's illness was recurrent "complete amnesia concerning his behaviour."

When the prosecutor proposed to introduce Blackburn's confession into evidence, his attorney objected, and the judge held a hearing to determine its admissibility. Blackburn's counsel submitted to the judge the depositions of two of the three doctors who had served on the lunacy commission and who had observed Blackburn during his period of treatment at the State Hospital. These depositions incorporated copies of three significant documents. The first was the court order directing examination of Blackburn by a lunacy commission. This order mentioned Blackburn's previous treatment in a mental ward and two of his prior commitments to mental institutions. The second paper was the lunacy commission's report, in which three state-employed doctors had expressed their opinion that Blackburn was insane both at the time of his admission to the hospital on July 29, 1948, and at the time of the robbery on April 19, 1948.

Finally, the depositions set forth the order which permanently committed Blackburn to the State Hospital. In addition to attesting to the accuracy of these documents, the deponents set forth in detail their opinion of Blackburn's mental condition. Dr. Harry S. Rowe, the Assistant Superintendent of the Hospital, who had worked since 1923 exclusively with psychopathic patients, stated that as a member of the lunacy commission he had participated in its investigation and in the submission of its report. Dr. Rowe also said that he had interviewed Blackburn on many occasions since his commitment and that he not only still thought Blackburn had been insane on the date of the crime but also believed he "most probably [had been] insane and incompetent" on May 8, 1948, when he had confessed. These opinions of Dr. Rowe were seconded by Dr. J. S. Tarwater, a psychiatrist who was Superintendent of the Alabama State Hospitals.

To counter this evidence, the prosecutor introduced the deposition of the third member of the lunacy commission, Dr. A. M. Richards, a general practitioner who had spent the previous twelve years treating mental patients and who was a staff member of the State Hospital. The doctor's answers to petitioner's interrogatories were in harmony with the depositions of Drs. Tarwater and Rowe: Dr. Richards acknowledged that he had served on the lunacy commission, that he had signed the report, and that he had concurred in the finding that Blackburn had been insane on the date of the crime. He disclaimed having any other information of value, and noted in response to a cross-interrogatory that Blackburn had been "up on the criminal ward and he was such a nuisance until I didn't see him often." In his answers to other cross-interrogatories, however, Dr. Richards executed an astonishing about-face by opining that Blackburn had been "normal" since he first saw him, that his mental

condition was "normal" on the date of the crime and "good" on the date of the confession, and that he had never seen Blackburn suffer "psychotic episodes." Even this portion of the deposition is not without incongruity, however, for Dr. Richards' response to one cross-interrogatory was that he did *not* believe Blackburn had experienced lucid intervals.

Evidence concerning the circumstances surrounding the making of the confession was supplied by the Chief Deputy Sheriff. He testified that the interrogation had consumed "something like, maybe five or six hours" on May 8, 1948, and that no one had threatened Blackburn in any way. The Chief Deputy composed the statement in narrative form on the basis of Blackburn's answers to the various questions asked by the officers, and Blackburn signed the confession two days later. When asked about Blackburn's behavior, the witness responded that Blackburn had "answered like any normal person I have examined." After the judge ruled that the confession would be admitted, but before it was actually admitted, the Chief Deputy described in somewhat greater detail—this time to the jury—the manner in which the confession had been obtained. It developed that the examination had begun at approximately one o'clock in the afternoon and had continued until ten or eleven o'clock that evening, with about an hour's break for dinner. Thus it was established that the questioning went on for eight or nine hours rather than five or six. Apparently most of the interrogation took place in closely confined quarters—a room about four by six or six by eight feet—in which as many as three officers had at times been present with Blackburn. The Chief Deputy conceded that Blackburn said he had been a patient in a mental institution, but claimed that Blackburn also stated he had been released, and avowed that Blackburn "talked sensible and give [*sic*] sensible answers," was clear-eyed, and did not appear nervous.

Blackburn's counsel again objected to admission of the statement, but the objection was overruled and the confession was submitted to the jury. After the Alabama Court of Appeals affirmed the judgment and held that the Fourteenth Amendment did not require exclusion of the confession, Blackburn petitioned this Court for certiorari.[4] Thus was the constitutional issue raised, decided, and presented to this Court for review.

After according all of the deference to the trial judge's decision which is compatible with our duty to determine constitutional questions,[5] we are unable to escape the conclusion that Blackburn's confession can fairly be characterized only as involuntary. Consequently the conviction must be set aside, since this Court, in a line of decisions beginning in 1936 with *Brown* v. *Mississippi*, 297 U. S. 278, and including cases by now too well known and too numerous to bear citation, has established the principle that the Fourteenth Amendment is grievously breached when an involuntary confession is obtained by state officers and introduced into evidence in a criminal prosecution which culminates in a conviction.

---

[4] The Alabama Court of Appeals wrote two opinions in this case. After the first, 38 Ala. App. 143, 88 So. 2d 199, and after the Alabama Supreme Court had denied certiorari, 264 Ala. 694, 88 So. 2d 205, we granted certiorari, 352 U. S. 924, and later vacated the judgment and remanded the case to the Court of Appeals because we were uncertain whether that court had passed upon the federal question. 354 U. S. 393. The Court of Appeals reaffirmed the judgment of conviction, 40 Ala. App. ——, 109 So. 2d 736, and the Alabama Supreme Court again denied certiorari, 268 Ala. 699, 109 So. 2d 738. The case was then ripe for our review, and we granted certiorari once more. 359 U. S. 1010.

[5] It is well established, of course, that although this Court will accord respect to the conclusions of the state courts in cases of this nature, we cannot escape the responsibility of scrutinizing the record ourselves. *E. g., Spano* v. *New York*, 360 U. S. 315, 316; *Pierre* v. *Louisiana*, 306 U. S. 354, 358; *Chambers* v. *Florida*, 309 U. S. 227, 228–229.

Since *Chambers* v. *Florida,* 309 U. S. 227, this Court has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition. A number of cases have demonstrated, if demonstration were needed, that the efficiency of the rack and the thumbscrew can be matched, given the proper subject, by more sophisticated modes of "persuasion." [6] A prolonged interrogation of an accused who is ignorant of his rights and who has been cut off from the moral support of friends and relatives is not infrequently an effective technique of terror. Thus the range of inquiry in this type of case must be broad, and this Court has insisted that the judgment in each instance be based upon consideration of "[t]he totality of the circumstances." *Fikes* v. *Alabama,* 352 U. S. 191, 197.

It is also established that the Fourteenth Amendment forbids "fundamental unfairness in the use of evidence, whether true or false." *Lisenba* v. *California,* 314 U. S. 219, 236. Consequently, we have rejected the argument that introduction of an involuntary confession is immaterial where other evidence establishes guilt or corroborates the confession. *E. g., Spano* v. *New York,* 360 U. S. 315, 324; *Payne* v. *Arkansas,* 356 U. S. 560, 567–568; *Watts* v. *Indiana,* 338 U. S. 49, 50, n. 2; *Haley* v. *Ohio,* 332 U. S. 596, 599. As important as it is that persons who have committed crimes be convicted, there are considerations which transcend the question of guilt or innocence. Thus, in cases involving involuntary confessions, this Court enforces the strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his

---

[6] *E. g., Spano* v. *New York,* 360 U. S. 315; *Fikes* v. *Alabama,* 352 U. S. 191; *Watts* v. *Indiana,* 338 U. S. 49; *Turner* v. *Pennsylvania,* 338 U. S. 62; *Harris* v. *South Carolina,* 338 U. S. 68; *Ashcraft* v. *Tennessee,* 322 U. S. 143.

will. This insistence upon putting the government to the task of proving guilt by means other than inquisition was engendered by historical abuses which are quite familiar. See *Chambers* v. *Florida, supra,* at 235–238; *Watts* v. *Indiana, supra,* at 54–55.

But neither the likelihood that the confession is untrue nor the preservation of the individual's freedom of will is the sole interest at stake. As we said just last Term, "The abhorrence of society to the use of involuntary confessions . . . also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." *Spano* v. *New York, supra,* at 320–321. Thus a complex of values underlies the stricture against use by the state of confessions which, by way of convenient shorthand, this Court terms involuntary, and the role played by each in any situation varies according to the particular circumstances of the case.

In the case at bar, the evidence indisputably establishes the strongest probability that Blackburn was insane and incompetent at the time he allegedly confessed. Surely in the present stage of our civilization a most basic sense of justice is affronted by the spectacle of incarcerating a human being upon the basis of a statement he made while insane; and this judgment can without difficulty be articulated in terms of· the unreliability of the confession, the lack of rational choice of the accused, or simply a strong conviction that our system of law enforcement should not operate so as to take advantage of a person in this fashion. And when the other pertinent circumstances are considered—the eight- to nine-hour sustained interrogation in a tiny room which was upon occasion literally filled with police officers; the absence of Blackburn's friends, relatives, or legal counsel; the composi-

tion of the confession by the Deputy Sheriff rather than by Blackburn—the chances of the confession's having been the product of a rational intellect and a free will become even more remote and the denial of due process even more egregious.

'It is, of course, quite true that we are dealing here with probabilities. It is *possible,* for example, that Blackburn confessed during a period of complete mental competence. Moreover, these probabilities are gauged in this instance primarily by the opinion evidence of medical experts. But this case is novel only in the sense that the evidence of insanity here is compelling, for this Court has in the past reversed convictions where psychiatric evidence revealed that the person who had confessed was "of low mentality, if not mentally ill," *Fikes* v. *Alabama, supra,* at 196, or had a "history of emotional instability," *Spano* v. *New York, supra,* at 322. And although facts such as youth and lack of education are more easily ascertained than the imbalance of a human mind,[7] we cannot say that this has any appreciable bearing upon the difficulty of the ultimate judgment as to the effect these various circumstances have upon independence of will, a judgment which must by its nature always be one of probabilities.

Of course, this case is no different from other involuntary confession cases in another respect—where there is a genuine conflict of evidence great reliance must be placed upon the finder of fact. It is this proposition upon which respondent's principal argument rests, for the trial judge's decision is said to be inviolable because of an alleged conflict between the depositions of Dr. Richards on the one hand and Drs. Tarwater and Rowe on the other. We need not in this case consider the relevance

---

[7] Lack of education is a factor frequently present in this type of case; and in *Haley* v. *Ohio, supra,* the fact that the accused was a 15-year-old youth weighed heavily in the Court's judgment.

of the fact that the trial judge, like ourselves, had no opportunity to witness the demeanor of these doctors. It is sufficient to observe that the deposition of Dr. Richards is in such hopeless internal conflict that it raises no genuine issue of fact. It would be unreasonable in the extreme to base a determination upon those portions in which the doctor proclaimed Blackburn normal while ignoring those portions in which he judged Blackburn insane. Nor have we overlooked the testimony of the Chief Deputy that Blackburn "talked sensible," was clear-eyed, and did not appear nervous. But without any evidence in the record indicating that these observed facts bore any relation to Blackburn's disease or were symptoms of a remission of his illness, we are quite unable to conclude that such an inference can be drawn.[8] The Fourteenth Amendment would be an illusory safeguard indeed if testimony of this nature were held to raise a "conflict" which would preclude appellate review of a case where the evidence of insanity is as compelling as it is here.

We take note also of respondent's argument that our decision must be predicated solely upon the evidence introduced by defendant before admission of the confession. As we have indicated, this evidence consisted of the depositions, the copies of the documents incorporated therein, and the testimony of the Chief Deputy. The other relevant evidence, which included the detailed medical record of Blackburn's mental illness prior to his arrest, was introduced at a later stage of the trial. It is quite true that Blackburn's counsel, so far as the record shows, made no request that the judge reconsider his

---

[8] It is interesting to note that Blackburn's medical records disclose that in 1944 he was given a diagnosis of "Psychosis, manic depressive, manic phase," and yet was said to answer questions "relevantly and coherently." Dr. Rowe stated that it was clear Blackburn "was suffering from schizophrenia of the paranoic type. They . . . entertain delusions . . . ."

ruling on the basis of this additional data. The Alabama Court of Appeals decided that under these circumstances this further documentation of Blackburn's insanity was not, under state law, material to the Fourteenth Amendment question.

Even if respondent's argument were meritorious our decision would be the same, since the evidence introduced prior to admission of the confession was ample to establish its involuntariness. But we reject the notion that the scope of our review can be thus restricted. Where the involuntariness of a confession is conclusively demonstrated at any stage of a trial, the defendant is deprived of due process by entry of judgment of conviction without exclusion of the confession. An argument similar to respondent's was disposed of in *Brown* v. *Mississippi,* 297 U. S. 278, in the following words:

> "That contention rests upon the failure of counsel for the accused, who had objected to the admissibility of the confessions, to move for their exclusion after they had been introduced and the fact of coercion had been proved. It is a contention which proceeds upon a misconception of the nature of petitioners' complaint. That complaint is not of the commission of mere error, but of a wrong so fundamental that it made the whole proceeding a mere pretense of a trial and rendered the conviction and sentence wholly void. . . . We are not concerned with a mere question of state practice, or whether counsel assigned to petitioners were competent or mistakenly assumed that their first objections were sufficient. . . .
>
> "In the instant case, the trial court was fully advised by the undisputed evidence of the way in which the confessions had been procured. The trial court knew that there was no other evidence upon which conviction and sentence could be based. Yet

it proceeded to permit conviction and to pronounce sentence. The conviction and sentence were void for want of the essential elements of due process . . . ." *Id.*, at 286–287.

Just as in *Brown,* the evidence here clearly establishes that the confession most probably was not the product of any meaningful act of volition. Therefore, the use of this evidence to convict Blackburn transgressed the imperatives of fundamental justice which find their expression in the Due Process Clause of the Fourteenth Amendment, and the judgment must be

*Reversed.*

MR. JUSTICE CLARK concurs in the result.