Commonwealth ex rel. Gaito, Appellant, *v.*
Maroney.

Argued April 15, 1965. Before ERVIN, P. J., WRIGHT,
WATKINS, MONTGOMERY, JACOBS, and HOFFMAN, JJ.
(FLOOD, J., absent).

*Stanley J. Reisman*, with him *Zigmund L. Dermer*,
for appellant.

*Edwin J. Martin*, Assistant District Attorney, with
him *Robert W. Duggan*, District Attorney, for appellee.

OPINION PER CURIAM, June 17, 1965:
Orders affirmed.

---

DISSENTING OPINION BY HOFFMAN, J.:
The Supreme Court of Pennsylvania in *Commonwealth ex rel. Gaito v. Maroney*, 416 Pa. 199, 204 A. 2d 758 (1964), directed that a hearing be held in a lower court, ". . . in the presence of the defendant and consistent with the requirements of due process, to determine the voluntariness of Gaito's oral confession which was introduced in evidence at his trial before that Court for burglary and assault with intent to kill."

After such a hearing, the lower court found that the confession was voluntary and, accordingly, denied the petition. From this denial, petitioner now appeals.

The confession here at issue is based on the following circumstances:

At about 3:00 a.m. on February 28, 1959, petitioner was found outside of Mercy Hospital, Pittsburgh, in a critical condition from a bullet wound. At about 4:00 a.m., he was examined by a resident surgeon who noted that he had a penetrating wound in his abdomen.

A decision was made to operate immediately. Between 4:00 a.m. and 5:45 a.m., petitioner was administered a general anesthetic, pentothal, intravenously. Subsequently, a gaseous anesthetic consisting of a cyclopropane-oxygen mixture was administered continuously for 3½ hours until 9:20 a.m.

Surgery commenced at 5:45 a.m. The patient was in critical condition both before and during the operation. The operating surgeon stated at the time of the operation that he believed petitioner might die.

The bullet had passed through petitioner's upper abdominal wall opposite the ninth costal cartilage on the left side in the epigastric region. It went from there through the left lobe of his liver, through both walls of his stomach, and through the gastro-colic omentum, which is the membrane which joins the stomach to the large bowel. It severed the pedicle of the spleen, went through the diaphragm, went through his left chest and was in the subcutaneous tissues overlying the eleventh or twelfth rib of the left side of his back. The operation required the closing of two holes in petitioner's liver, the sewing up of the anterior and posterior walls of his stomach, and the sewing up of his gastro-colic omentum, which was bleeding. Petitioner's spleen was removed, his diaphragm was repaired on the left side, his abdomen was drained, and rubber catheters were placed in his left pleural space.

Prior to and during the operation, forty percent of his blood was replaced by transfusions.

The operation, which lasted 3¼ hours, was completed at 9:00 a.m. The hospital records show that petitioner was in poor condition at this time.

At 9:30 a.m., petitioner received for sedation an injection of demerol, an analgesic-narcotic. Other medications administered after the operation were penicillin, streptomycin, chloromycetin, and adrenosem.

At 11:30 a.m., a Lavine tube, which passed transnasally into petitioner's upper gastro-intestinal tract, was reinserted by the attending physician, since petitioner had "probably vomited it out." The Lavine tube was draining dark, thick red material. The patient was described in the hospital records as "somewhat confused" at this time.

. At 1:00 p.m., only 4 hours following the completion of this very serious operation, petitioner's condition was as follows: Six tubes, which had been inserted at various stages in the operative procedure, emanated from his body. Two emanated from his nostrils, two from his chest, one from his abdomen and one from his urethra. In addition, a needle was inserted into him for intravenous feeding. For the purpose of keeping him fully restrained, his arms and legs were tied to his bed.

At this time, an assistant district attorney of Allegheny County entered the hospital room. While alone with petitioner, the assistant district attorney questioned petitioner for approximately fifteen to thirty minutes about his alleged part in the crimes for which he was subsequently convicted. At trial he testified, over objection, that petitioner confessed to his participation in these crimes during this interrogation.

The hospital records show that at 2:30 p.m., one hour after the assistant district attorney's interrogation, petitioner was "speaking but very incoherent",

and that at 3:30 p.m., "the condition remains the same." Additionally, the doctor's progress report during this period indicated that the patient's "condition [was] very critical", and that he was "semiconscious."

Petitioner testified at trial that he had no recollection of any event occurring on Saturday, February 28, and that he regained his senses in the early afternoon of the next day.

Dr. Siker, the Commonwealth's expert witness, testified that the drugs administered before, during and after the operation might not have affected the volition of petitioner. However, on cross-examination, Dr. Siker was confronted with the medical records and information mentioned above and was then asked:

"I would like to ask you this considering the totality of the circumstances is there a reasonable doubt that the confession in question was the product of Mr. Gaito's free and conscious will, that he was lucid and had such control of his mental faculties as to be capable of fully . . . understanding Mr. Strauss' questions, reflecting upon them, and forming intelligent answers to them as a result of his normal reasoning processes, or in other words is there a reasonable doubt that this confession was voluntary?"

Dr. Siker's answer to this question was:

"Yes, there is. But I would like to qualify this answer also. I would like to qualify that answer by stating that to do so would be to take at complete and accepting face value the record as it stands, the note of semi-consciousness, the note of incoherency, and if we were to accept each of these notes as unquestioned documentation then I would certainly say that there was reasonable doubt."

I conclude from my reading of the testimony and my analysis of the evidence that petitioner was deprived of his liberty without due process of law in that:

(1)   The evidence indicates that the confession, if given, was not voluntary and free.

(2)   At the time of the alleged confession, petitioner was not informed of his right to counsel or of his right to remain silent.

# I

The U. S. Supreme Court decided in *Jackson v. Denno,* 378 U. S. 368 (1964), that the voluntary nature of a confession must be independently determined by someone other than the jury which determines the question of guilt or innocence of the accused.[1]

No case has yet been decided wherein certain fundamental aspects of these added procedures have been fully explained. Foremost among these are the questions of burden of proof and sufficiency of the evidence.[2] Whatever burden is determined to be proper,

---

[1] The Supreme Court made clear in the *Jackson* case, however, at p. 391, n. 19 that: "Whether the Trial Judge, another Judge, or another jury, but not the convicting jury, fully resolves the issue of voluntariness is not a matter of concern here. To this extent we agree with the Stein case that *the States are free to allocate functions between judge and jury as they see fit.*" (Emphasis added.) It should be noted that on March 15, 1965, the Supreme Court of Pennsylvania promulgated Pa. Crim. R. 323 which will become effective September 15, 1965. This rule establishes a procedure whereby a judge holds a ". . . hearing in the presence of only the defendant, counsel for the parties, court officers and necessary witnesses for the purpose of determining, fully and independently, whether or not the confession was made voluntarily."

[2] In his dissenting opinion in *Jackson v. Denno,* supra, Mr. Justice BLACK states at 404: "Another disadvantage to the defendant under the Court's new rule is the failure to say anything about the burden of proving voluntariness. The New York rule does now and apparently always has put on the State the burden of convincing the jury beyond a reasonable doubt that a confession is voluntary. [citing cases] The Court has not said that its new constitutional rule, which requires the judge to decide voluntari-

however, it is clear to me that the findings of the lower court on voluntariness are not supported by the evidence.

Petitioner had just undergone a very serious operation in which the surgeon believed he might die. At the termination of the operation at 9:30 a.m., his condition was described as "poor." At 11:30 a.m., only 1½ hours before the interrogation began, hospital records show the patient's mental condition as "somewhat confused." At 2:30 p.m., only one hour after the completion of the interrogation, hospital records show that petitioner was "speaking but very incoherent." The same records show that at 3:30 p.m., "the condition remains the same," and that at about 2:45 p.m. the patient was "very critical and semi-conscious." The Commonwealth's expert witness stated his opinion that the effect of the drugs administered would have dissipated by 1:00 p.m., and that petitioner could have recovered his faculties at 1:00 p.m. and then regressed shortly thereafter.[3] Nevertheless, this expert witness also testified that in view of all the circumstances, there was reasonable doubt that the confession was voluntary.[4]

---

ness, also imposes on the State the burden of proving this fact beyond a reasonable doubt. Does the Court's new rule allow the judge to decide voluntariness merely on a preponderance of the evidence? If so, this is a distinct disadvantage to the defendant. In fashioning its new constitutional rule, the Court should not leave this important question in doubt."

[3] The doctor admitted also that his opinion as to petitioner's lucidity was greatly dependent upon the testimony of the assistant district attorney.

[4] Significantly, the lower court failed to mention this portion of the doctor's testimony and referred only to his testimony concerning the effect of the drugs. It would appear to me, however, that the fact that appellant was not administered a second analgesic-narcotic until 9:30 that evening, despite the extreme degree of his trauma, would suggest that the level of orientation and degree of response from shock were below the usual experience. This would tend to support my belief that appellant's level of con-

The only evidence as to the circumstances of the alleged confession is the testimony of the assistant district attorney. Although he testified that there did not appear to him to be any impairment of petitioner's mental faculties, I cannot agree with the lower court that his opinion was credible.

The assistant district attorney admitted that petitioner was in very critical condition during the interrogation and that "he had more difficulty talking than I had hearing at the time." He also assumed that petitioner "was in pain." When asked if certain questions had been raised during the interrogation, he answered: "No, I didn't go into any details. He didn't look as though he was in a condition to go to minute details as we like to do when the circumstances permit."

I am particularly wary of the assistant district attorney's testimony because of his admitted lack of interest in petitioner's condition. At trial, he was asked:

"Q. You didn't care about what his condition was, did you? A. I was more concerned about the police officer, Mrs. Matson, to be perfectly honest with you, than I was Frank Gaito at that time. Q. And you went there with one purpose and one purpose in mind and that was to establish the connection between Frank Gaito and Officer Scorzafave, right? A. If I could, I mean, that was my hope when I went in there . . ."

In summary, all of the records relating to appellant's condition indicate that his state of orientation was compromised from 11:30 a.m. to 3:30 p.m. on the day of the interrogation. It seems unreasonable to conclude that this state was totally reversed at 1:30 p.m., only to be re-established again by 2:30 p.m. The testimony of the assistant district attorney indicating that appellant could talk coherently does not establish

---

sciousness and orientation were compromised, so that volition would also be compromised.

that his sensorium was clear or that his full volitional faculty was intact. Even the Commonwealth's expert witness testified that as to this, there was a reasonable doubt. I cannot find that the confession was voluntary.

## II

At the time of the alleged confession, appellant was not informed of his right to counsel or of his right to remain silent. It is true that our Supreme Court has decided that "a statement or confession made during interrogation by the police, *if voluntarily made,* may be constitutionally admissible in evidence even though the accused was neither warned of his right to remain silent, nor of his right to counsel." *Commonwealth v. Patrick,* 416 Pa. 437, 206 A. 2d 295 (1965). See also *Commonwealth ex rel. Linde v. Maroney,* 416 Pa. 331, 206 A. 2d 288 (1965).

Mr. Justice ROBERTS in the *Linde* case, supra, expressed his concern, however, in a concurring opinion: ". . . I am somewhat bothered by the fact that a 'request test' may protect only those who know enough to request counsel. Those most likely to know that they should request counsel are often persons in criminal trouble before, perhaps the habitual criminal. Those who are having their first encounter with the law may be much less likely to have either the knowledge or presence of mind to request counsel."

Similarly, in *U. S. ex rel. Russo v. State of New Jersey,* 351 F. 2d 429 (3d Cir. 1965), the Circuit Court held that a request is unnecessary. In that case, the court stated: "We can perceive no sound basis for holding that a request for counsel is a prerequisite for the right to counsel at the interrogation stage while it is not at any other. The test of waiver is the same, or

should be, no matter what stage of the proceedings is at issue, so long as the right has attached."

Mr. Justice ROBERTS further assumes in the *Linde* case, supra, that, "No doubt we shall have further guidance from the Supreme Court of the United States on this subject."

I cannot foretell the ultimate determination on this question. It is clear to me, however, that the questioning of a suspect under the circumstances described above clearly violates our sense of justice and fair play. The seriousness of petitioner's operation and condition mandated that extraordinary precautions be taken to protect his constitutional right to counsel. I cannot believe that the Supreme Court of Pennsylvania, in its decisions, has sanctioned a procedure which may permit a confession to be extracted from a suspect whose volition is so greatly in doubt, unless his rights are protected to the fullest extent.

I would remand for a new trial and not permit the admission of testimony relating to the alleged confession.