Commonwealth ex rel. Gaito, Appellant, *v.* Maroney.

172

Argued March 16, 1966. Before MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Stanley J. Reisman,* with him *Zigmund L. Dermer,* for appellant.

*Robert W. Duggan,* District Attorney, with him *Edwin J. Martin,* Assistant District Attorney, for appellee.

OPINION BY MR. JUSTICE ROBERTS, June 24, 1966:

This case comes before this Court for the second time. In our previous decision,[*] we remanded the record to the Court of Oyer and Terminer of Allegheny County for a hearing on the issue of the voluntary nature of appellant's oral confession. Cf. *Jackson v. Denno,* 378 U. S. 368, 84 S. Ct. 1774 (1964). In accordance with our directive, the Court of Oyer and Terminer of Allegheny County held a hearing, in the presence of appellant, and inquired into the circumstances surrounding the challenged confession. At the termination of the proceedings, the court concluded that the confession was constitutionally unobjectionable and entered an order remanding appellant to the custody of the appropriate authorities. On appeal, the Superior Court affirmed, one judge dissenting. *Com-*

---

[*] 416 Pa. 199, 204 A. 2d 758 (1964).

*monwealth ex rel. Gaito v. Maroney,* 206 Pa. Superior Ct. 113, 210 A. 2d 907 (1965) (per curiam). We allowed appellant's petition for allocatur and brought the case before the bar of this Court. Such is the present posture of the case.

The facts are undisputed. The record reveals that at about 3:00 a.m. on February 28, 1959, appellant was discovered at the entrance to the Mercy Hospital in the City of Pittsburgh. A superficial examination disclosed a bullet wound in his abdomen and he was removed to the hospital where he was administered oxygen together with blood and intravenous fluids. The attending physicians decided that immediate surgery was necessary.

Between 4:00 a.m. and 5:45 a.m. a general anesthetic, comprised of a dose of pentothal administered intravenously and, subsequently, a gaseous mixture consisting of cyclopropane-oxygen, was administered to appellant. Surgery commenced at 5:45 a.m. At this time, appellant's condition was considered by his physicians to be critical.

During surgery, it was determined that the bullet had passed through appellant's upper abdominal wall at a point opposite the ninth costal cartilage on the left side in the epigastric region. In the course of its trajectory, the bullet had penetrated the left lobe of appellant's liver and both walls of his stomach, passing through the gastro-colic omentum. It had also severed the pedicle of the spleen, passed through the diaphragm and the left chest and was found imbedded in the subcutaneous tissue surrounding the eleventh or twelfth rib of the left side of appellant's back.

The operation comprised the closure of the perforations of appellant's liver, the anterior and posterior walls of his stomach, and the gastro-colic omentum. His spleen was removed, the damage to the left side of the diaphragm repaired, and the abdomen drained.

The operation was completed at 9:00 a.m., some 3½ hours after its inception. Up to this point in time, appellant had received transfusions which in volume equalled approximately 40% of his blood supply. His condition at the conclusion of surgery was listed on the hospital records as "poor".

At 9:30 a.m., an injection of demerol, a narcotic, was administered appellant as a sedative. He also received other medications, including penicillin, streptocmycin, chloromycetin, and adrenosem. In addition, he continued to receive various fluids intravenously. As a result, six tubes, inserted at various stages in the operative and post-operative procedure, emanated from appellant's body: two for intravenous feeding, two from the chest, one from the abdomen, and one from the urethra.

At 1:00 p.m., some 4 hours after the completion of the surgery, an assistant district attorney, investigating the crimes for which appellant was subsequently convicted, entered the hospital room to speak to appellant. Permission for the interview was not secured from the attending physician nor was any effort made to ascertain appellant's condition.

While alone with appellant, the assistant district attorney questioned him for approximately 15 to 30 minutes. During the course of the conversation, the incriminating statement which is the subject of the present dispute was elicited from appellant.

The hospital records indicate that at 2:30 p.m., approximately one hour after the confession was obtained, appellant was listed as "speaking but very incoherent." At 3:30 p.m., his condition was listed as unchanged. Progress reports during this period continued to characterize appellant's condition as "critical" with occasional notations of lapses into semiconsciousness.

At trial, appellant testified that he had no recollection of the confession and that his first recollection was of events occurring in the early afternoon of the following day, February 29th.

At the hearing below, the Commonwealth sought to establish the voluntary character of the confession through the testimony of two witnesses. The only direct testimony as to the circumstances of the confession was that of the assistant district attorney to whom the statements were made. Although he testified that appellant's mental faculties did not appear impaired during the interview, he admitted that appellant had difficulty speaking and that he assumed appellant to be in pain. Moreover, he limited the scope of the questions because "[appellant] did not look as though he was in condition to go into minute details as we like to do when the circumstances permit."

Dr. Siker, the Commonwealth's expert witness, testified that the effects of the drugs and anesthesia administered appellant would have been dissipated at the time the confession was elicited. However, on cross-examination, he qualified his testimony and admitted that the totality of the circumstances cast doubt on appellant's ability to understand, to reflect upon, and to form intelligent answers to the questions propounded during the interview.

It is a basic and fundamental principle of constitutional law that a defendant in a criminal case is deprived of due process if his conviction is founded, in whole or in part, upon an involuntary confession. *Jackson v. Denno,* 378 U.S. 368, 376, 84 S. Ct. 1774, 1780 (1964); *Rogers v. Richmond,* 365 U.S. 534, 541, 81 S. Ct. 735, 740 (1961). The introduction of such a confession over objection constitutes reversible error, see *Townsend v. Sain,* 372 U.S. 293, 310, 83 S. Ct. 745, 755 (1963); *Rogers v. Richmond,* supra at 540, 81 S. Ct. at 739; *Stroble v. California,* 343 U.S. 181, 190, 72

S. Ct. 599, 603 (1952), even though there is ample evidence aside from the confession to sustain the conviction. *Jackson v. Denno,* supra; *Haynes v. Washington,* 373 U.S. 503, 518, 83 S. Ct. 1336, 1345-46 (1963); *Malinski v. New York,* 324 U.S. 401, 404, 65 S. Ct. 781, 783 (1945).

Equally well established are the standards to be applied in making the ultimate constitutional determination. If the accused's "will was overborne" or if his confession was not "the product of a rational intellect," the incriminating statement is not voluntary within the meaning of the federal constitution, *Townsend v. Sain,* supra at 307, 83 S. Ct. at 754; see *Blackburn v. Alabama,* 361 U.S. 199, 206, 80 S. Ct. 274, 280 (1960); *Lyons v. Oklahoma,* 322 U.S. 596, 602, 64 S. Ct. 1208, 1212 (1944), without regard to the fact that its truth may be independently established. See *Jackson v. Denno,* supra; *Rogers v. Richmond,* supra; *Haynes v. Washington,* supra.

The nature of the question presented is such that "no single litmus-paper test for constitutionally impermissible interrogation has been evolved . . . ." *Culombe v. Connecticut,* 367 U.S. 568, 601, 81 S. Ct. 1860, 1878 (1961). The range of judicial inquiry into the voluntariness of appellant's confession is broad and our judgment must be based upon consideration of the "totality of the circumstances." *Blackburn v. Alabama,* supra at 206, 80 S. Ct. at 280; *Fikes v. Alabama,* 352 U.S. 191, 197, 77 S. Ct. 281, 284 (1957). The absence of evidence of improper purpose on the part of the police will not preclude the conclusion that the confession was involuntary, if appellant's physical and mental state were such as to sap his powers of resistance and self control. See *Lynumn v. Illinois,* 372 U.S. 528, 83 S. Ct. 917 (1963); *Townsend v. Sain,* supra at 307, 83 S. Ct. at 754; *Culombe v. Connecticut,* supra at 602, 81 S. Ct. at 1879; *Blackburn v. Alabama,* supra.

Applying these standards to the circumstances of the instant case, we are inevitably led to the conclusion that the introduction at trial of appellant's confession "transgressed the imperatives of fundamental justice which find their expression in the Due Process Clause of the Fourteenth Amendment." *Blackburn v. Alabama,* supra at 211, 80 S. Ct. at 282. Accordingly, his conviction may not stand and he must be afforded a new trial.

In reaching this conclusion, we are strongly influenced by the fact that the hospital records cast grave doubt upon appellant's capacity to comprehend the nature of his circumstances and the consequences of his conduct at the time the confession was obtained. As the dissent in the Superior Court noted, "all of the records relating to appellant's condition indicate that his state of orientation was compromised from 11:30 a.m. to 3:30 p.m. on the day of the interrogation. . . ." *Commonwealth ex rel. Gaito v. Maroney,* 206 Pa. Superior Ct. 113, 210 A. 2d 907 (1965) (HOFFMAN, J., dissenting).

It is, of course, quite possible that the challenged confession may have been obtained while appellant was completely lucid and mentally competent. However, our judgment as to the effect of the circumstances under which the confession was obtained upon appellant's mental capacity to confess must by its nature be one based upon probabilities. See *Blackburn v. Alabama,* supra at 208, 80 S. Ct. at 281. When the pertinent circumstances are considered—the shock and weakened condition engendered by his wound, the extensive and serious nature of the surgery performed upon him, the quantity of anesthetic and medication administered to him, the occasional lapses into semi-consciousness and incoherence—the probability that appellant's confession was the product of a rational intellect and a free will

appears remote. Cf. *Blackburn v. Alabama,* supra at 207-08, 80 S. Ct. at 280-81.

It is sufficient for present purposes to note that Dr. Siker's testimony, when considered in its entirety, raises no genuine issue of fact. It would be unreasonable to base a determination upon those portions of his testimony relating to the residual effect of the drugs at the time the confession was made while ignoring those portions in which he expressed doubt as to appellant's competence to conduct himself in a fully rational fashion. Likewise, we have not overlooked the testimony of the assistant district attorney to whom the confession was given. While the latter testified that appellant appeared in full possession of his faculties, the very fact that appellant's condition prompted him to terminate the interview without fully exploring the incriminating admissions derogates from the weight to be accorded his testimony and precludes us from inferring that the statements were voluntary on the basis thereof.

Under such circumstances, we must consider the case as one in which the confession was not the product of a rational intellect. Cf. *Malinski v. New York,* supra at 410, 65 S. Ct. at 786. On that assumption, one compelled by the record, our basic sense of justice is affronted by its introduction at appellant's trial. Our judgment is based not only on the lack of rational choice on the part of appellant but also on "a strong conviction that our system of law enforcement should not operate so as to take advantage of a person in this fashion." *Blackburn v. Alabama,* supra at 207, 80 S. Ct. at 280; cf. *Townsend v. Sain,* supra; *Spano v. New York,* 360 U.S. 315, 79 S. Ct. 1202 (1959); *Fikes v. Alabama,* supra; *Gessner v. United States,* 354 F. 2d 726 (10th Cir. 1965).

Accordingly, the order of the Superior Court is reversed. The order of the Court of Common Pleas of

Allegheny County is reversed and the record remanded to that court with directions to issue the writ and to grant a new trial.