Commonwealth *v.* Witherspoon, Appellant.

Argued November 23, 1970. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Daniel M. Rendine,* with him *Herbert A. Barton,* for appellant.

*Benjamin H. Levintow,* Assistant District Attorney, with him *Milton M. Stein,* Assistant District Attorney, *James D. Crawford,* Deputy District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE POMEROY, June 1, 1971:

Before the Court are three appeals from judgments of sentence entered against Lawrence Witherspoon, appellant, by the Court of Common Pleas of Philadelphia County. After a jury trial appellant was found guilty of murder in the first degree, burglary and robbery and was sentenced to life imprisonment and two consecutive ten-to-twenty year terms.

The record discloses the following facts. On the evening of November 4, 1964, at approximately 7:30-8:00 P.M., appellant and his accomplice, Ernest Satchell, while passing by a taproom at 228 Race Street, Philadelphia, decided to burglarize it. Satchell entered the bar and ordered a drink. Appellant followed shortly and also ordered a drink. Then both left the bar for a moment and returned announcing to the patrons and bartender that a holdup was in progress. Witherspoon was carrying a loaded gun.

The two men ordered the five patrons and the bartender towards the back of the bar, and all except Joseph Ambrose, the deceased, immediately obeyed. Ambrose, who was sitting at the bar with his back to Satchell and Witherspoon, apparently did not comprehend what was happening and did not move. When appellant reached a point a few feet from Ambrose, the latter turned on the stool, and Witherspoon fired a single shot which struck Ambrose in the head. Satchell and appellant then took approximately $150 from the cash register plus a small amount the patrons had left on the bar and fled.

On December 8, 1964, at approximately 1:40 A.M., two police officers stopped the car Ernest Satchell was driving for failure to yield the right-of-way. As Satchell emerged from the car, the car's interior light revealed a gun lying on the floor which Satchell stated belonged to Lawrence Witherspoon. The officers arrested Satchell for possession of the gun, and upon checking the car's registration, they discovered that it belonged to appellant.

Present by chance at the magistrate's office during Satchell's preliminary hearing later that morning were Officers McKendry and Hill who knew appellant and became interested when they heard appellant's name mentioned in connection with the gun and car. They then decided to go to Witherspoon's home to talk to him. It should be noted that at this time the police had no evidence to connect appellant with the robbery-murder at 228 Race Street and, in fact, had no evidence that appellant had committed any crime.

The officers went to appellant's residence at approximately 12:45 P.M. and asked whether he would accompany them to the police station, as they wanted to talk to him. They arrived at headquarters at approximately 1:00 P.M., and appellant was questioned intermittently from then until 9:20 P.M. when he made an inculpatory statement. He was given no warnings at all until approximately 8:30 P.M., when an officer who had been questioning Satchell entered the room in which Witherspoon was being questioned and announced that Satchell had made an inculpatory statement and had implicated appellant. That officer testified that he told appellant of Satchell's statement and told him he had the right to obtain an attorney and to remain silent and not say anything unless he chose to. It was following this caution that appellant made the inculpatory oral statement.

Prior to trial appellant moved to suppress (a) testimony as to his oral statement, (b) his subsequent written statement, (c) a tape recording of the written confession, (d) the record of appellant's fingerprints taken December 8, 1964 (these were matched with fingerprints found at the scene of the crime), (e) the gun taken from Satchell at the time of his arrest, and (f) a diagram of the crime scene drawn by appellant after he concluded his confession. This motion was denied by the suppression court.

It was and is appellant's theory that as of 12:45 P.M. on December 8, 1964, he was under arrest, that such arrest was not based upon probable cause, that the confession was the fruit of the unlawful arrest, that he was not given the warnings required by *Escobedo v. Illinois,* 378 U.S. 478 (1964) (his trial began March 17, 1966), and that the incriminating statements were unconstitutionally coerced. In contrast it is the Commonwealth's theory that appellant was not under arrest as of 12:45 P.M., that the police were engaged in proper investigatory activities, that even if the detention were improper the confession was not obtained by exploitation of that illegality, that appellant was given the proper *Escobedo* warnings at the time they were required (after Satchell had confessed and appellant had become a prime suspect), that appellant did not request and was not denied an opportunity to consult with his lawyer, and that the confession was not coerced.

It is not necessary for us to decide these difficult issues, for a close reading of the record as a whole discloses that the evidence against appellant was so overwhelming that even if there had been a violation of appellant's constitutional rights, it was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18 (1967); *Commonwealth v. Diaz,* 438 Pa. 356, 264 A.

2d 592 (1970). We have previously held that *Escobedo* violations are subject to the *Chapman* harmless-error rule, *Commonwealth v. Padgett*, 428 Pa. 229, 237 A. 2d 209 (1968), and *Escobedo* is the essence of appellant's argument.[1]

Stephen Kriverotsky, the bartender at the 228 Race Street taproom, unequivocally identified Satchell and Witherspoon as the men who robbed the bar and its patrons. He was also an eyewitness to the murder and testified that when appellant was approximately a foot and a half from Ambrose the latter turned his head and appellant shot him in the face. Kriverotsky stated, "Q. At any time prior to the shot did Mr. Ambrose get off the stool or attempt to get off the stool? A. No, sir. He didn't know what was going on. All he did was turn his head from the left, and he turned his head and that was all."

Alexander O'Drain, a patron of the taproom, testified that appellant entered the bar with a gun in his hand and ordered everyone to get to the back of the

---

[1] Appellant's contention that the incriminating statements were unconstitutionally coerced, if meritorious, would require automatic vacation of the judgments of sentence and the grant of a new trial. *Chapman v. California, supra,* note 8. But cf. *United States ex rel. Moore v. Follette,* 425 F. 2d 925, 928 (2d Cir. 1970) (FRIENDLY, J.), cert. denied, 398 U.S. 966 (1970).

It appears, however, that appellant is raising this issue for the first time before this Court. In his testimony at the suppression hearing, he said nothing which would indicate that he believed that " 'his will [had] been overborne and his capacity for self-determination critically impaired.' " *Commonwealth ex rel. Butler v. Rundle,* 429 Pa. 141, 149, 239 A. 2d 426 (1968).

In addition, the record in this case presents a far different picture from that in *Butler, supra,* or *Commonwealth ex rel. Gaito v. Maroney,* 422 Pa. 171, 220 A. 2d 628 (1966). In fact, before making his statement, appellant was the subject of an on-the-record inquiry by the police as to the voluntariness of the confession. He stated that he was making the statement willingly, voluntarily and not as the result of fear, threats or promises.

room. "Q. Tell us what happened if anything as you were walking back? A. Well, as I walked back, I was last in line. Vincent Coyle was in front and then John Tubeless, who is not here, he was in back of him and then I was in back and as I was approaching Mr. Ambrose, he had his back towards me. He started turning his head from the left to the right when I approached, and then Mr. Ambrose started to turn his head left to right and I got half a foot beyond him and I heard this crack. Q. What kind of 'crack'? A. Like a gun report. I turned around slow and as I did, Mr. Ambrose was coming off the stool like in slow motion. In the meantime, the (appellant) had the gun on all of us."

Vincent Coyle also positively identified appellant as the man who entered the bar, drew a gun and stated, "Go into the rear of the bar. This is a holdup. This is it." Although he was not an eyewitness to the murder, his testimony as to the surrounding circumstances corroborated that of the other witnesses. These witnesses were definite and firm in their testimony and were not shaken at all during cross-examination.

This evidence against appellant was overwhelming, and upon a reading of the record as a whole we are able to say that if there were any violation of appellant's constitutional rights it was harmless error beyond a reasonable doubt.

Judgments of sentence affirmed.

Mr. Justice COHEN took no part in the decision of this case.