417 A.2d 1210

**COMMONWEALTH of Pennsylvania**

v.

**Dennis McQUAID, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 12, 1979.

Filed Jan. 4, 1980.

Petition for Allowance of Appeal Denied Sept. 9, 1980.

602

Joel S. Moldovsky, Philadelphia, for appellant.

James B. Jordan, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before SPAETH, HESTER and CAVANAUGH, JJ.

CAVANAUGH, Judge:

This is an appeal from judgment of sentence entered after a lengthy trial before Kubacki, J. and a jury. Appellant was found guilty of criminal conspiracy; possession of an instrument of crime, generally; robbery and aggravated assault. He was sentenced to 1½ to 3 years for criminal conspiracy; 1½ to 3 years for a possession of an instrument of crime, generally; 2½ to 5 years for aggravated assault; and 10 to 20 years for robbery. All sentences are to run concurrently with the sentence for robbery.

At about 9:00 a. m., July 12, 1977, the doorbell rang at the home of Mr. Zarenkiewicz, an elderly man residing in Philadelphia, Pennsylvania. As he went to answer the doorbell, two men, one of whom was armed with a double barrel shotgun, ran into his home and asked him where his money was. The man with the shotgun threatened to kill Mr. Zarenkiewicz if he did not tell him where he kept his money and subsequently taped the victim's eyes, mouth and feet. The men ripped out the telephone and ransacked Mr. Zarenkiewicz's home. While this was occurring Mrs. Zarenkiewicz arrived home from a shopping trip. When she walked into the living room she observed one of the men holding a shotgun and she started to scream for help. The intruder

with the gun threatened to kill Mrs. Zarenkiewicz if she continued screaming. She continued to do so and was struck on the head and pushed down the steps. As a result of this she suffered a broken hip and was hospitalized for over three weeks. An operation was required for the insertion of a pin and plate in her hip.

The two intruders fled from the premises with two encyclopedias and three or four books containing coins which belonged to Mr. Zarenkiewicz. They were observed by a witness whose attention was caught by two men running out the front door of Mr. Zarenkiewicz's house, one of whom was carrying books over his head and the other a shotgun. The witness, who at the time his observations were made, was driving his car, stopped and heard Mrs. Zarenkiewicz moaning. He wrote down the license number of the car in which the two men fled. He also observed that the car was a green foreign make four door automobile and that three men were in it when it was driven away. He observed that the man carrying the shotgun wore a plaid shirt. This information was shortly thereafter given to the police.

The description of the car and of two of the three white males occupying the car and the license number and the direction the car was heading were broadcast over the police radio. At about ten minutes after nine a police officer observed the fleeing vehicle which had been described on the police broadcast and gave chase. The officer put on the dome light of his car to signal the fleeing vehicle to stop but it did not do so. On the contrary, it increased speed. By this time the police officer informed headquarters that he was in pursuit of the vehicle and also put on the sirens in his police car. During the chase the officer observed the doors of the pursued vehicle being opened and an object fell out one of the doors. The pursued vehicle sped into a parking lot and went into a ditch. Three males ran from the car which was then in an area of high grass and bushes. The officers shouted to the men to stop. One of the men turned and threw a machete toward the police officer who then opened fire at the fleeing men. One of the men was shot

and killed. This was Raymond Dales, the owner of the vehicle in which the men fled from the Zarenkiewicz house. A second man who was standing a few feet away from Mr. Dales when he was shot fled into the high grass. The third man observed fleeing from the automobile was captured by police a few minutes later. This man was Carl Miller, who was a co-defendant at appellant's trial.

Other police officers joined in the search and about one-half hour later the appellant was found hiding in the heavy undergrowth about 45 feet from where the machete was found. Appellant was wearing a plaid shirt of the same description as that worn by the man who fled from the automobile. Police officers located the stolen coins and books in the automobile in which the men fled. At about 10:00 a. m. appellant was taken to Parkview Hospital in an emergency patrol wagon together with Detective O'Brien and other police officers. On the way to the hospital appellant stated that he had been shot. Although appellant was loud when he arrived at the hospital and insisting that his girl friend be called, he appeared to calm down when the doctor told him his wound did not look too serious. Appellant was examined and was found to have a wound in the back of his head behind his right ear. The wound appeared to be slightly less than a quarter inch in diameter. Appellant's injury was treated and he was administered fluids intravenously. While waiting in the hall of the hospital for x-rays to be taken and while lying on a type of wheeled-stretcher, he made a statement to Officer O'Brien after having been advised of his constitutional rights. In the course of his statement to Detective O'Brien appellant stated that "I was there, I did it. We only got some lousy coins". The interview with Officer O'Brien lasted from about 11:15 to 11:35 a. m. and at 12:25, after appellant had been x-rayed, he was discharged from the hospital. He was subsequently taken to the police administration building and arraigned at approximately 3:00 p. m.

Appellant's first contention is that the court below erred in not suppressing his inculpatory statement that he was

involved in the crime. Appellant contends that his statement was involuntary and relies principally upon the case of *Commonwealth v. Perry*, 475 Pa. 1, 379 A.2d 545 (1977), an opinion by Manderino, J. in which Eagen and Nix, JJ. concurred in the result. Pomeroy, J., filed a dissenting opinion in which O'Brien and Packel, JJ. joined. In the *Perry* case the defendant was shot in the chest and taken to the hospital and placed in intensive care with the bullet still lodged in his chest. Throughout the night medical personnel monitored the defendant's vital signs. At 4:00 in the morning the defendant received demerol for pain and was given additional medicine at about 9:00 a. m. At 10:00 a. m. a police interrogation began which lasted one hour and twenty minutes. During the interrogation the defendant asked for medicine for the pain and it was refused. During this time there was also a catheter in the defendant and he was being fed intravenously. Intravenous feeding continued constantly for four days and the catheter remained in the defendant for two days. The Supreme Court held that the inculpatory statement made by the defendant was involuntary and also stated that statements made by injured persons in a hospital setting must be considered extremely suspect, 475 Pa. at 6, 379 A.2d at 547.

Appellant argues that the *Perry* case, *supra*, suggests a trend toward the inadmissibility of in-hospital confessions as a matter of law. We do not agree with this conclusion. Although *Perry, supra,* refers to in-hospital confessions as "suspect" it does not make the voluntariness of a confession dependent upon the place where it occurred. To be valid, a confession must be the product of an essentially free and unconstrained choice by its maker. *Commonwealth v. Irvin*, 462 Pa. 383, 386, 341 A.2d 132, 133 (1975).

The range of judicial inquiry into the voluntariness of a confession is broad and judgment must be based on the totality of the circumstances. *Blackburn v. State of Alabama*, 361 U.S. 199, 206, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960). A very important circumstance in determining the totality of the circumstances is the mental and physical

condition of the accused at the time the inculpatory statement is made. *Commonwealth v. Holton*, 432 Pa. 11, 17, 247 A.2d 228, 231 (1968). In order to determine the voluntariness of the appellant's confession we must look at all of the circumstances surrounding the making of the confession including the fact that he was hospitalized at the time. We have considered the fact that he was admitted to the hospital at about 10:10 in the morning and was treated for what appeared to be a small gunshot wound of the head. While waiting in the hallway for x-rays and while lying on a stretcher he gave a statement to Officer O'Brien after being advised of his right not to make any incriminatory statement. At that time the appellant was lying on a stretcher type of vehicle and was quiet, appeared to be alert and responsive to the detective's questions. In *Commonwealth v. Moore*, 454 Pa. 337, 311 A.2d 620 (1973), the defendant made an inculpatory statement while he was sick and complained of cramps and was apparently suffering from drug withdrawal symptoms. During the period that he made the confession he asked to be taken to the hospital and in fact was taken to the hospital and given medication there. He returned to the police station and continued with his statement. The court found the confession to be voluntary although a short period of hospitalization was involved during the time that the statements were made. The court found credible the testimony of two police officers as to his condition and ability at the time of making the statement.

In *Commonwealth ex rel. Gaito v. Maroney*, 422 Pa. 171, 220 A.2d 628 (1966), the Supreme Court found a confession to be involuntary where the defendant had been shot in the stomach and the bullet had penetrated his liver, both walls of the stomach and passed through the gastro-colic omentum. The defendant was operated on in the early morning and at that time his condition was considered to be critical. The operation lasted some three and one-half hours and at the conclusion of the surgery his condition was listed in the hospital records as poor. After surgery the defendant received demerol, a narcotic, and various other medications

and received various fluids intravenously. About four hours after the operation an assistant district attorney obtained an inculpatory statement from the defendant. An hour after the statement was obtained the hospital records indicated that the defendant was speaking but was very incoherent and the record also indicated that the defendant lapsed into semi-consciousness. The gravity of the facts in the cases of *Commonwealth v. Perry, supra,* and *Commonwealth ex rel. Gaito v. Maroney, supra,* stand in sharp contrast to those in the instant case.

We are satisfied from a thorough review of the record that the inculpatory statement made by the appellant in this case was voluntary notwithstanding that it was made in a hospital setting, and was not the result of any overbearing influence by the police.

■ Appellant also contends that the admission into evidence of the out of court statement of his co-defendant, Carl Miller, violated his Fifth Amendment privilege against self-incrimination and his Sixth Amendment right to confrontation of witnesses. An examination of the record reveals that this contention is without merit. Appellant's co-defendant gave a statement to the police, part of which was read at appellant's trial, after references to the appellant were deleted. In the statement, Miller, who denied knowing any of the participants in the crime, described the events of the morning of the crime. His statement included the following:

"... I walked down to Wyoming Avenue to where Parkview Avenue starts, like the parking lot. That's when a small green car picked me up. While going over Wyoming toward 'D' street where I live. The next thing I know about three blocks after I got in the car, there was a regular police car behind us flashing their lights. The guy said 'Don't stop' or 'I'm not stopping.' Then we blew a light and went down a one way street . . . ."

"Q. Have you ever seen the person who picked you up before?

"A. No.

"Q. Describe them.

"Mr. Ciccone [appellant's counsel]: Objection.

"THE COURT: I will sustain your objection."

Appellant objects to the use of the word "them" in the statement on the ground that it referred to more than one other person in the car. The question "describe them" follows the previous question "have you ever seen the *person* who picked you up before?" The question means, of course, describe the person who picked you up. Even if the objected to word "them" is given its literal meaning so that the jury could infer that there was more than one other person in the car besides the driver, we fail to see how this implicates appellant as being one of the persons in the car. All references to appellant were deleted from the statement. We note also that the presence of three males in the green automobile was testified to by at least two witnesses.

Appellant relies on the landmark case of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), to sustain his position that the statement of the co-defendant was inadmissible. In *Bruton* the United States Supreme Court held that at a joint trial it was error for a postal inspector to testify that Evans (a co-defendant of the petitioner) confessed that Evans and petitioner committed an armed robbery. The court below was fully aware of the problems in admitting a co-defendant's statement and made a deliberate effort to have Miller's statement redacted to avoid violation of *Bruton's* rule.

The minor error in using the word "them" rather than "him" does not warrant the granting of a new trial. " . . . [I]nstances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently. 'A defendant is entitled to a fair trial but not a perfect trial.' " *Bruton v. United States*, 391 U.S. at 135, 88 S.Ct. at 1627.

Appellant also relies on *Commonwealth v. Bosman*, 213 Pa.Super. 258, 247 A.2d 647 (1968) which held that a co-defendant's statement was prejudicial in that it impliedly implicated the defendant in the robbery for which the defendant was being tried. In the *Bosman* case the co-defend-

ant's statement referred to the fact that the defendant was present in the co-defendant's apartment when the property taken in the robbery was divided. This case does not assist appellant as the redacted statement of appellant's co-defendant did not in any way implicate him.

■ It is well settled that redaction can be an appropriate method of protecting a defendant's rights under the *Bruton* decision. If a confession can be edited so that it retains its narrative integrity and yet in no way refers to the defendant, the use of it does not violate the principles of *Bruton*. *Commonwealth v. Johnson*, 474 Pa. 410, 412, 378 A.2d 859, 860 (1977).

The third issue raised by the appellant is whether the trial judge erred in not recusing himself from hearing the appellant's motion to suppress evidence and presiding at the appellant's jury trial since he had presided over a jury trial involving the appellant some three years previously. The earlier trial had resulted in a verdict of not guilty.

■ Initially, it should be noted that the appellant did not request Judge Kubacki, who presided over the motion to suppress and the actual jury trial to recuse himself before the trial. Further, the party seeking the disqualification of a trial judge has the burden of producing evidence tending to show bias, prejudice or unfairness by the judge. *Commonwealth v. Conrad*, 241 Pa.Super. 324, 328, 361 A.2d 421 (1976). In this case appellant has not produced a scintilla of evidence to establish bias or prejudice by the trial judge. Appellant's counsel stated at page 35 of his appellate brief: " . . . nothing can be directly pointed out regarding instances of the court's intentional prejudice during the jury trial . . . .".

■ Appellant argues in effect that a trial judge must be found to be biased and prejudiced by reason of the fact that he presided over a prior jury trial involving the same defendant. He has cited no authority to support this argument and we find it to be without merit.

Appellant refers to the trial judge in his brief on appeal as the factfinder in his trial, which is inaccurate. Appellant was tried before a judge and jury and the jury alone was the finder of fact. It is inappropriate for the appellant to cite *Commonwealth v. Bobko*, 453 Pa. 475, 309 A.2d 576 (1973) which deals with the issue of knowledge by the jury of the defendant's prior criminal record, and not with the situation in the matter now before us for review.

The final issue for our consideration is whether appellant's sentence was excessive when compared with the sentence imposed upon the co-defendant, Carl Miller. Appellant and Carl Miller were jointly tried in the court below. Miller was sentenced as follows: 4 to 10 years for robbery; 2½ to 5 years for aggravated assault; 1½ to 3 years for conspiracy and 1½ to 3 years for possession of an instrument of crime, generally.

Appellant does not contend that his sentence is excessive in itself but only in relation to the lesser sentence which was imposed on his co-defendant. Appellant received a sentence of 10 to 20 years for robbery and as noted previously lesser sentences for criminal conspiracy, possession of an instrument of crime, generally, and aggravated assault. All sentences are to run concurrently with the sentence for robbery.

It is fundamental that the sentencing judge has broad discretion in imposing sentence, and the sentence will not be disturbed on appeal unless it exceeds the statutorily prescribed limits or is so manifestly excessive as to constitute too severe a punishment. *Commonwealth v. Wrona*, 442 Pa. 201, 206, 275 A.2d 78, 81 (1971). Each case raising the issue of excessive sentence must be reviewed on the circumstances of that case alone, recognizing that the trial judge has broad discretion in imposing sentence. *Commonwealth v. Hill*, 237 Pa.Super. 543, 564, 353 A.2d 870, 882 (1975).

The trial judge must state the reasons for the sentence he imposes. *Com. v. Riggins*, 474 Pa. 115, 133, 377 A.2d 140, 149 (1977); *Com. v. Wertz*, 252 Pa.Super. 584, 585, 384 A.2d 933, 935 (1978). At sentencing, the trial judge stated that appel-

lant had sixteen arrests and nine convictions. His convictions included the crimes of burglary, larceny and possession of narcotics. The court also noted that appellant had violated probation three times and had also violated parole. The reports before the court recommended that appellant be incarcerated. Further, the court considered the seriousness of the assault and robbery of an aged couple and the fact that they had been terrorized and that one of the victims still suffered from a broken hip.

■ As noted above, a more lenient sentence was imposed on Carl Miller, appellant's co-defendant. In order for a trial judge to impose different sentences on co-defendants, he must find differences between the co-defendants to justify the sentences. *Com. v. Thurmond,* 257 Pa.Super. 464, 467, 390 A.2d 1330, 1331 (1978). Judge Kubacki noted at Carl Miller's sentencing that he had been arrested four times and had two previous convictions. He also stated that Miller had cooperated with the authorities when he had been on probation. The reports before the judge recommended that Miller be committed to a correctional institution.

■ Appellant was resentenced after the earlier sentence was vacated. At resentencing, the same sentence was imposed on appellant as originally imposed. At the resentencing, appellant's counsel pointed out the disparity of the sentences between Carl Miller and appellant. The court stated:

"They are different people, considerably different people. I must view them as different people. I have to look at the whole man and that is what I have done."

We find that the court has sufficiently stated his reasons for the sentence imposed on the appellant and the reasons why the appellant received a more severe sentence than his co-defendant.

Judgment of sentence affirmed.