William Mark GOODMAN, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 882S302.

Supreme Court of Indiana.

Sept. 26, 1983.

Walter E. Bravard, Jr., Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Amy Schaeffer Good, Deputy Atty. Gen., Indianapolis, for appellee.

PRENTICE, Justice.

Defendant (Appellant) was convicted after a bench trial of Murder, a class A felony, Ind.Code § 35–42–1–1(1) (Burns 1979), and sentenced to forty (40) years imprisonment.

This direct appeal presents two issues for review:

1. Whether the trial court erred in failing to hold a third competency hearing prior to Defendant's trial.

2. Whether Defendant's confession was voluntarily given.

The record disclosed that on December 14, 1977, the Defendant and his girlfriend, Mary Spitznagel, argued about money, and, in the presence of a guest, Jimmy Rogers, the Defendant hit her repeatedly with a pool stick. When she fell to the floor, Defendant stepped on her throat inflicting injuries which led to her death. The Defendant and Rogers placed the victim in Defendant's automobile and left her in an abandoned house where her body was found on December 17, 1977.

After Defendant filed a missing person report, he and Rogers fled to Utah. Eventually Rogers provided information which led to the arrest of the Defendant in Tulsa, Oklahoma. On February 6, 1978, in Tulsa, the Defendant gave a statement in which he admitted killing Mary Spitznagel.

On July 3, 1978, the Defendant filed a Suggestion of Insanity, and Drs. Hull and Schuster were appointed by the court to evaluate him. On August 25, 1978, at a competency hearing, the court determined that Defendant lacked the competency to stand trial and ordered him to be committed to the Department of Mental Health.

On August 11, 1981, the court was advised by the Mental Health authorities that the Defendant was capable of assisting in his defense. On September 23, 1981, the Defendant filed a second Suggestion of Insanity, and Drs. Hull and Schuster were again appointed to evaluate the Defendant. On October 22, 1981, they submitted their report declaring Defendant competent to stand trial. The court held a hearing on October 28, 1981 at which both Drs. Hull and Schuster testified; the Defendant was found competent to stand trial. Subsequently, the Defendant requested additional psychiatric evaluation, and Drs. Periolat and Nie were appointed to examine him. On January 7, 1982, Dr. Nie sent a letter to the court in which he stated that it was doubtful that Defendant would ever be competent enough to stand trial. His opinion was based on an examination of the Defendant made on January 3, 1982. However, during the trial, on February 17, 1982, Dr. Nie testified that he had changed his opinion about the Defendant's competency to stand trial and that he was, in fact, then competent to stand trial.

\* \* \* \* \* \*

## ISSUE I

The Defendant contends that the trial court should have held a third competency hearing after Dr. Nie's letter was received by the court and before the trial inasmuch as the letter constituted "reasonable grounds" to hold another competency hearing pursuant to Ind.Code § 35–5–3.1–1 (Burns 1979) which provides:

"(a) If at any time before the final submission of any criminal case to the court or jury trying the same, the court, either from its own knowledge or upon the suggestion of any person, has reasonable grounds for believing that the defendant lacks the ability to understand the proceedings and assist in the preparation of his defense, the court shall immediately fix a time for a hearing to determine whether the defendant has that ability. The court shall appoint two (2) competent disinterested psychiatrists, who shall examine the defendant for the purpose of forming an opinion as to whether the defendant has that ability and shall testify concerning the same at the hearing."

The right to a competency hearing is not absolute. *Feggins v. State,* (1980)

Ind., 400 N.E.2d 164, 166. Such a hearing is required by the above statute and due process only when there is evidence before the trial court that creates a reasonable or bona fide doubt as to the defendant's competency. *Pate v. Robinson,* (1966) 383 U.S. 375, 385, 86 S.Ct. 836, 842, 15 L.Ed.2d 815, 822; *Cook v. State,* (1972) 258 Ind. 667, 670, 284 N.E.2d 81, 83. The presence of indicators sufficient to require the court to hold a hearing under Ind.Code § 35–5–3.1–1 must, of necessity, be determined upon the facts of each case as it arises, and the decision whether to hold a competency hearing lies in the province of the trial judge. *Malo v. State,* (1977) 266 Ind. 157, 160–161, 361 N.E.2d 1201, 1204. This is particularly true when no petition for a competency hearing has been filed, as was the case here. *Mato v. State,* (1982) Ind., 429 N.E.2d 945, 947.

In the case at bar, two competency hearings had been held previously. The Defendant had been found incompetent at the first hearing in August, 1978. Three years later, on October 28, 1981, another full competency hearing was held. Both court appointed psychiatrists testified that the Defendant was competent to stand trial based upon their recent examinations and observations of him. Also received into evidence at that hearing was Dr. John Keating's psychiatric report and letter declaring that, in his opinion, "the patient has a reasonable understanding of the proceedings and will be able to assist his lawyer in his own defense." Conflicting evidence was admitted in the form of a letter from Dr. Periolat who had examined the Defendant several years earlier and on the day prior to the competency hearing. His letter stated that the Defendant had no memory of the crime or victim and had no understanding of the purpose of the court procedure; therefore, in his opinion, the Defendant was not competent to stand trial at the time. However, his letter further indicated that the Defendant, at the time of his examination, was "alert, oriented to the year and place [and] aware of his circumstances and surroundings." In addition, Dr. Periolat stated that the Defendant was "aware of the charge against him and of the possible conse-

quences." After submission of all the evidence, the court found the Defendant competent to stand trial.

On December 2, 1982, the Defendant petitioned for the employment of additional psychiatrists to examine him in preparation for an insanity defense and to testify at the trial; the court granted that petition, appointing Dr. Nie as one of the examining psychiatrists. Dr. Nie examined the Defendant on January 3, 1982 and notified the court on January 7, 1982 that, in his opinion, the Defendant was not competent to stand trial. His letter to the court concluded thus:

"On the basis of the present examination, it seems that this man understands the nature of the charge against him but at the present time, I doubt that he has the capacity to cooperate adequately with his attorney in defending himself. It's difficult to determine whether his impaired memory functions are due to true organic disease or whether or not this might be a form of malingering. From the meager history that this man gives however, it seems that his life-long pattern has been makred (sic) by emotionally unstable behavior by excessive alcohol intake. I have no way of evaluating what his mental state was at the time of the alleged crime, but it seems quite clear that this man belongs in a protective environment at the present time. I believe it's doubtful that he will ever be able to stand trial."

A somewhat similar situation arose in *Malo v. State,* (1977) 266 Ind. 157, 361 N.E.2d 1201, in which, prior to trial, the defendant had requested a third competency hearing. In that case we wrote:

"There was no event or occurrence subsequent to the determination of competence which amounted to reasonable grounds requiring a third hearing. Conceivably, incompetence might occur subsequent to a determination of competence, in which event a trial should not be had or, if commenced, a mistrial declared. Were we to follow the course of action urged by the defendant, however, a trial could

never be had where the defendant's incompetence was being urged. Under such circumstances, there will always be indicators present which could be the basis of a reasonable ground for believing the defendant to have insufficient comprehension to be brought to trial. The existence of facts which would be reasonable grounds under some circumstances does not ipso facto mandate a hearing under all circumstances. The decision whether or not to hold a hearing lies in the province of the trial judge and should be disturbed upon review, only upon a showing of clear error. The indicators proffered by the defendant did not, in the context of this case, mandate a third hearing." *Malo* at 1204.

■ Dr. Nie was appointed to examine the Defendant in preparation for his insanity defense. His letter to the court was unsolicited and irrelevant at that time. Notwithstanding other conflicting evidence, the court had determined that the Defendant was competent to stand trial. Dr. Nie's letter, taken into consideration with all of the other circumstances and evidence presented in the court proceedings to date, did not constitute reasonable grounds to mandate a third competency hearing.

■ Assuming arguendo, however, that the trial court did abuse its discretion in failing to hold a third competency hearing, the error was rendered harmless by Dr. Nie's testimony at the trial. At that time, Dr. Nie, during cross-examination by Defendant's counsel, testified as follows:

"Q. Is it still your opinion that the defendant is not able to now stand trial?

"A. No, I think subsequent events probably would have modified that opinion in the sense that with the knowledge of the crime that he demonstrates, and with the evidence and character of his so-called memory deficits that I could conceive of the fact that he can stand trial, certainly."

In light of Dr. Nie's testimony at the trial, the Defendant could not have been harmed by the court's failure to hold a third competency hearing, if, assuming arguendo, it was required to do so. Only when the error has caused prejudice to the defendant is there cause to reverse. *Yager v. State,* (1982) Ind., 437 N.E.2d 454, 463; *Smith v. State,* (1982) Ind., 432 N.E.2d 1363, 1368.

### ISSUE II

Defendant further contends that in light of his low intelligence level his confession was not voluntary and should have been suppressed.

■ A statement by an accused is not admissible against him if it is not voluntarily given. *Ortiz v. State,* (1976) 265 Ind. 549, 553, 356 N.E.2d 1188, 1191. It is the State's burden to prove, beyond a reasonable doubt, that the defendant voluntarily and intelligently waived his rights and that the defendant's confession was voluntarily given. *Powell v. State,* (1982) Ind., 437 N.E.2d 969, 970; *Rodgers v. State,* (1979) 270 Ind. 372, 374, 385 N.E.2d 1136, 1137; *Burton v. State,* (1973) 260 Ind. 94, 105, 292 N.E.2d 790, 797–798. In determining whether this burden has been met we look to the totality of the circumstances, including whether the confession was freely self determined, the product of a rational intellect and free will, without compulsion of inducement by way of violence, threats, promises or other improper influence, so as to overcome the free will of the accused. *Tawney v. State,* (1982) Ind., 439 N.E.2d 582, 586; *Long v. State,* (1981) Ind., 422 N.E.2d 284, 285; *Turner v. State,* (1980) Ind., 407 N.E.2d 235, 237. However, in reviewing the trial court's ruling upon the issue we will not weigh the evidence, but rather determine whether there was substantial probative evidence to support the finding of the trial court. *Rodgers,* 385 N.E.2d at 1137–1138; *Ortiz,* 356 N.E.2d at 1191; *Works v. State,* (1977) 266 Ind. 250, 263, 362 N.E.2d 144, 150.

In the case at bar, the record disclosed that Detectives William Burgess and James Parnell, Indianapolis Police Officers, travelled to Tulsa, Oklahoma to interview the Defendant, then in custody. The question-

ing began on February 6, 1978 at approximately 11:27 a.m. and ended approximately two hours later. Detectives Burgess and Parnell, a stenographer, and a local detective were present during the interview, which the Defendant had requested and which took place in an office environment, a room at least ten feet by twelve feet, surrounded by windows. No facilities for tape recording were available; therefore, Detective Burgess asked a question which was immediately typed, then read orally to the Defendant who responded. His response was typed as it was given.

Once the statement was completed, Burgess and the Defendant went over it question by question. Because Detective Burgess was concerned about the Defendant's literacy, every question was read back to him and, if the Defendant indicated a lack of understanding, further explained. The Defendant was given an opportunity to make any changes or corrections and initialled each page and signed his full name and date on the last page.

Prior to the questioning, Burgess orally advised the Defendant of his rights and asked him if he understood them. The Defendant said that he did. Subsequently, the Defendant executed a written rights waiver form which Burgess orally explained to him. The Defendant never indicated that he wanted an attorney or that he wanted the questioning stopped. Following the completion of the statement, Burgess asked the Defendant again if he had understood everything that had been discussed. The Defendant said that he had.

Detective Burgess noticed no signs of intoxication, physical disability, or any behavior that would indicate that the Defendant was of unsound mind or insane. He did testify that the Defendant cried periodically throughout the taking of the statement, but that the Defendant composed himself and answered the questions calmly.

The evidence further revealed that the Defendant had only a third grade education, had a pattern of excessive drinking, and, according to psychiatric reports, had a "spotty" memory and a limited "fund of knowledge and awareness of current events."

The defendant argues that answers to certain questions confirm his illiteracy and lack of understanding. In particular, he relies upon the following random questions and answers:

"Q. When you left Salt Lake City did you go to Arizona.

"A. I reckon this is Arizona.

"Q. Do you know what city you are in now.

"A. Oklahoma I reckon.

\* \* \* \* \* \*

"Q. Do you understand the English language as it is spoke to you.

"A. Its (sic) according to what it is.

\* \* \* \* \* \*

"Q. Do you read or write.

"A. I can read and write my own name. I can't read anything else to tell what it is.

"Q. What grade school level did you go to.

"A. I went to the third."

He further argues that Detective Burgess asked leading questions so that Defendant could answer with only a "yes" or "no" response.

Defendant, however, ignores coherent and lengthy responses to open ended questions asked by Burgess; Defendant's responses throughout the statement as a whole belie a lack of understanding. For example, when Burgess asked the Defendant what had occurred on December 14, 1977, the Defendant responded thus:

"When I had two friends over, a mother and a daught,r (sic) I had to take them home. As we was coming back we went and got some beer and liquor. We both was pretty well looped, me and her both. Then we got into it there at the house about cleaning the house. I her, (sic) she said something about if I didn't like it she would just go home and I said just go on home, (sic) Then me and Jimmy we was shooting pool in the middle of the room. She started to leave and I told her she

didn't have to, then she got a little smart and she was petty (sic) well drunk. Then I felw (sic) all to pieces and I slapped her and knocked her down and when I did I put my feet on her neck. That's all I remember."

Defendant relies upon *Robbins v. State,* (1968) 250 Ind. 219, 235 N.E.2d 199 to support his position. In *Robbins,* the appellant had a borderline I.Q. and was described by a psychiatrist as a "borderline feeble-minded individual." *Robbins,* 250 Ind. at 225, 235 N.E.2d 199. The Court found that the confession she gave was not voluntarily given. However, the case is distinguishable from the case at bar in light of all of the circumstances. Robbins was not only feeble-minded; she was also suffering from a mental disorder which continued throughout the trial and manifested itself in the belief that her three year old child, the victim, was still alive. In addition, she was not timely advised of her absolute right to remain silent and to have counsel. She was told to give a statement and had had no prior experience with law enforcement agencies or court procedures.

Defendant further relies upon *Blackburn v. Alabama,* (1960) 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242. Again, the totality of the circumstances distinguishes this case from the one at bar. In *Blackburn* the evidence established the strongest probability that the accused was insane and incompetent at the time of his confession. He was subjected to an eight (8) or nine (9) hour sustained interrogation in a tiny room which was on occasion filled with police officers. No friend, relative, or legal counsel was present, and the confession was composed by a deputy sheriff rather than by the accused and was not signed until two (2) days later.

Finally, the Defendant relies upon *Fikes v. Alabama,* (1957) 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246, in which the Court determined that an uneducated person of low mentality, who was perhaps mentally ill, did not give a voluntary confession. Again, it was the totality of the circumstances, not the low intelligence level alone, which led

the Court to hold that the defendant's confession was not voluntarily given. His only prior involvement with the law was a conviction for burglary; he was removed to a state prison far from his home; for a period of one week, he was kept in isolation, except for sessions of questioning; he saw no friend or relative; both his father and a lawyer were barred in attempts to see him; he was questioned for several hours at a time over the course of five (5) days preceding the first confession and again interrogated at length before a second confession was secured.

Cases more similar to the one at bar include *Jones v. State,* (1969) 253 Ind. 235, 252 N.E.2d 572, *cert. denied* 431 U.S. 971, 97 S.Ct. 2934, 53 L.Ed.2d 1069, and *Harrison v. State,* (1978) 269 Ind. 677, 382 N.E.2d 920, *cert. denied* 441 U.S. 912, 99 S.Ct. 2010, 60 L.Ed.2d 384. In *Jones,* the appellant had a low level of intelligence and poor reading ability. The Court, however, found that in light of the fact that the waiver of rights form was read to him word for word and that appellant twice said that he understood, the waiver was effective. In *Harrison,* the appellant also claimed that his waiver of rights and his statements were involuntary due to his low intelligence and poor reading skill. The evidence showed that he had an I.Q. of 90 and read at the fourth grade level. However, inasmuch as the rights form was read and explained to the appellant and that when he said he did not understand, the forms were further read and explained to him by a friend who was present, the Court held that his intelligence and reading ability were not such as would render his waiver of rights and his subsequent statement involuntary. *Harrison,* 382 N.E.2d at 924.

■ In the case at bar, the waiver of rights form was orally explained to the Defendant and signed by him. In addition, whenever the Defendant declared a lack of understanding of a question, it was re-read and explained to him. Lack of a formal education is more detrimental to the validity of a waiver in those cases in which the accused is merely given an advice of rights

form to read for himself. *Ortiz,* 356 N.E.2d at 1192. Further, the Defendant stated specifically that he understood both his rights and the questions asked in the interview and that he, nevertheless, waived their application to him. This is a strong factor supporting a finding of a voluntary waiver and a voluntary confession. *Tawney v. State,* (1982) 439 N.E.2d 582, 586. The surroundings in which the interview occurred were not oppressive by reason of size or conditions. The interview lasted only about two hours. In addition, the Defendant could not say that he lacked experience with law enforcement personnel or procedures, as he had had several prior experiences with them.

In light of all of these circumstances, the trial court did not err in ruling that the confession was voluntary and, therefore, admissible into evidence at the trial.

We find no reversible error. The judgment of the trial court is affirmed.

GIVAN, C.J., and DeBRULER, HUNTER and PIVARNIK, JJ., concur.