Robert POWELL, Appellant,

v.

Hon. William L. GRAHAM, Judge,
Franklin Circuit Court,
Appellee,

and

Commonwealth of Kentucky,
Real Party in Interest.

No. 2005–SC–625–MR.

Supreme Court of Kentucky.

Feb. 23, 2006.

J. Guthrie True, Johnson, True & Guarnieri, LLP, Frankfort, Counsel for Appellant.

William L. Graham, Franklin Circuit Judge, Frankfort, for Appellee.

Gregory D. Stumbo, Attorney General, Larry Wayne Cleveland, Commonwealth Attorney, Frankfort, Counsel for Real Party in Interest.

ROACH, Justice.

Appellant, Robert Powell, sought a writ of prohibition against the enforcement of a trial court order requiring him to submit to a separate mental health examination by the prosecutor's expert witness. The Court of Appeals denied the writ, opining that the trial court's order was appropriate because Appellant had placed his mental health in issue. While we hold that the trial court had the authority to compel Appellant to undergo the mental examination, because the trial court's order failed to prospectively provide appropriate protections for Appellant's Fifth Amendment rights, a writ should have issued. Therefore, we reverse.

## I. Background

On June 3, 2004, Appellant took an early lunch break from work, supposedly to take his wife to a doctor's appointment. When he got home, he found his wife unresponsive and cold to the touch, and he called 911. Emergency medical personnel soon arrived and found Appellant's wife dead. She had suffered for many years from lupus, depression, and fibromyalgia, the symptoms of which include chronic severe pain. She took a variety of medications, including morphine and methadone. A postmortem examination revealed that the concentration of morphine in her blood significantly exceeded the therapeutic level, and the Medical Examiner concluded

that she had died from "acute opiate intoxication."

Appellant began to exhibit mental and emotional problems soon after his wife's death. Early in the morning of June 30, 2004, while drinking alcoholic beverages, Appellant was observed putting fingernail polish remover in his mouth. He was taken to the Frankfort Regional Medical Center and released about seven hours later. Later that day while speaking with his father-in-law, Appellant allegedly confessed to having assaulted and slowly poisoned his wife with rat poison and drain cleaner over the weeks leading up to her death. Appellant then began putting shoe polish in his mouth.

The Kentucky State Police were contacted, and Appellant was taken to the Medical Center again. While there, he was diagnosed as suffering from acute psychosis, and arrangements were made to transfer him to the psychiatric unit at Samaritan Hospital in Lexington. While still at the Medical Center, KSP Detective Dennis Stockton and a Frankfort police officer advised Appellant of his *Miranda* rights and questioned him regarding his incriminating statements. Appellant again confessed to killing his wife, claiming that he had slowly poisoned her because they had not been sexually intimate for approximately four years. The Franklin County Sheriff's Office then transported Appellant to Samaritan Hospital, where he was to be kept and observed pursuant to a 72–hour commitment order. While at Samaritan, Appellant allegedly claimed to have smothered his wife and prayed, "Please, God, don't let them find out how I did this."

On July 2, 2004, Detective Stockton and another KSP Detective, Greg Wolf, went to Samaritan Hospital to question Appellant a second time. After being read his *Miranda* rights again, Appellant stated that he had not poisoned his wife but instead had smothered her with a pillow. Appellant claimed that he had sought a way of killing his wife that would make her death appear to have been the result of natural causes. He also claimed to have killed her to put her out of her (and his) misery.

Based on his statements to the detectives, Appellant was indicted by a Franklin County Grand Jury for murdering his wife. Appellant's case was set to be tried in January 2005. On November 12, 2004, Appellant's lawyer filed a motion requesting a continuance for the approaching trial. The motion indicated that the lawyer was in the process of investigating Appellant's apparent mental debilitation at the time he made the statements to the KSP detectives. The lawyer also stated that he anticipated seeking suppression of the statements based, at least in part, on Appellant's mental state at the time the statements were made. The prosecutor in the case filed a motion requesting that the trial court order Appellant to undergo a mental examination pursuant to RCr 7.24(3)(B)(ii) on grounds that Appellant had placed his mental condition in issue by announcing his intent to seek suppression of his statements based on his mental state.

On March 3, 2005, the trial court entered an order granting the prosecutor's motion. The trial court's order, however, relied on CR 35.01, which provides:

> When the mental ... condition of a party... is in controversy, the court in which the action is pending may order the party to submit to a ... mental examination by a physician ... or appropriate health care expert .... The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions, and scope of the exami-

nation and the person or persons by whom it is to be made.

In ordering the mental examination, the trial court expressly found that "[s]uch 'good cause' exists under the circumstances of this case...."

Appellant promptly sought relief from the Court of Appeals by filing a petition for a writ of prohibition against the trial court. The Court of Appeals denied the writ, claiming that Appellant's mental health status at the time he made his incriminating statements "directly bears upon the issue of [his] guilt." Thus, the court noted, RCr 7.24(3)(B)(ii) allowed the trial court to order Appellant to submit to a mental examination.

Appellant subsequently appealed to this Court as a matter of right. Ky. Const. § 115.

## II. Analysis

### A. Availability of the Writ

 We find ourselves once again faced with the task of addressing whether a party is entitled to a writ of prohibition. It was something of an understatement when we recently noted that "[e]xtraordinary writs are disfavored...." *Buckley v. Wilson,* 177 S.W.3d 778, 780 (Ky.2005).

> Relief by way of prohibition or mandamus is an extraordinary remedy and we have always been cautious and conservative both in entertaining petitions for and in granting such relief. This careful approach is necessary to prevent short-circuiting normal appeal procedure and to limit so far as possible interference with the proper and efficient operation of our circuit and other courts. If this avenue of relief were open to all who considered themselves aggrieved by an interlocutory court order, we would face an impossible burden of nonappellate matters.

*Bender v. Eaton,* 343 S.W.2d 799, 800 (Ky. 1961). A petitioner must make a significant showing for a writ even to be *available* in a given case because extraordinary writs inherently intrude into the workings of the lower courts and bypass the normal appellate process. Even in those rare cases when a writ is available as a remedy, the court originally hearing the petition retains its discretion to grant or deny the writ after examining the merits. Ultimately, the higher courts' power over the extraordinary writs "has no limits except ... judicial discretion, and each case must stand on its own merits." *Buckley,* 177 S.W.3d at 780. It is with this understanding in mind that we begin our discussion.

We recently clarified the high standards that must be met before a writ may be granted. *See Hoskins v. Maricle,* 150 S.W.3d 1 (Ky.2004) (returning to the standards announced in *Chamblee v. Rose,* 249 S.W.2d 775 (Ky.1952) and *Bender v. Eaton,* 343 S.W.2d 799, 800 (Ky.1961)). In the short time since then, we have repeatedly been called on to elaborate on the minutiae of these standards and their application. *See Fritsch v. Caudill,* 146 S.W.3d 926 (Ky.2004); *Grange Mut. Ins. Co. v. Trude,* 151 S.W.3d 803 (Ky.2004); *Russell County, Kentucky Hosp. Dist. Health Facilities Corp. v. Ephraim McDowell Health Inc.,* 152 S.W.3d 230 (Ky. 2004); *Newell Enterprises, Inc. v. Bowling,* 158 S.W.3d 750 (Ky.2005); *The St. Luke Hospitals, Inc. v. Kopowski,* 160 S.W.3d 771 (Ky.2005); *Independent Order of Foresters v. Chauvin,* 175 S.W.3d 610 (Ky.2005); *Buckley v. Wilson,* 177 S.W.3d 778 (Ky.2005). Despite the recent deluge of discussion of the law of writs, it is necessary to reiterate at least a summary of that law, if only to aid in framing our analysis. This is especially true in a case such as this one where the Court of Ap-

peals failed even to cite *Hoskins,* the now seminal writ case.

■ Our cases contemplate two categories or "classes" of cases where a writ of prohibition might be appropriate: (1) where the lower court is acting outside its jurisdiction, and (2) where the lower court is acting erroneously but within its jurisdiction. The standards for evaluating a petition for a writ under each class were succinctly stated in *Hoskins:*

> A writ of prohibition *may* be granted upon a showing that (1) the lower court is proceeding or is about to proceed outside of its jurisdiction and there is no remedy through an application to an intermediate court; or (2) that the lower court is acting or is about to act erroneously, although within its jurisdiction, and there exists no adequate remedy by appeal or otherwise and great injustice and irreparable injury will result if the petition is not granted.

150 S.W.3d at 10. Appellant claims that both classes of writs apply in this case.

### 1. No Jurisdiction

■ Appellant claims that the trial court was without jurisdiction to compel his participation in a mental health examination in this case because no statute or rule authorizes the examination of a criminal defendant in order to assist the prosecutor in responding to a motion to suppress. On this count, we disagree with Appellant. There is little question that the trial court had jurisdiction over this matter. Appellant was indicted by the Franklin County Grand Jury, and is now being prosecuted in the Franklin Circuit Court. This is sufficient to give the Franklin Circuit Court jurisdiction over the matter. Appellant's claim that there is no statute, rule, or other source of authority that allows the trial court to order such an exam-

ination is better understood as a claim that the trial court is acting in error.

### 2. Acting Erroneously

■ Appellant's second claim, that the trial court acted erroneously in making the order, is built on the claim of error discussed above. This claim is more persuasive. In addressing this aspect of the Appellant's claims, we first note that the trial court's order contained no requirement that affirmative steps be taken to protect Appellant's Fifth Amendment rights. No doubt, the Commonwealth would argue that because the trial court's order was made pursuant to a request under RCr 7.24(3)(B)(ii), which contains express protections relating to a defendant's Fifth Amendment rights, no such express requirement in the order is necessary. But the trial court expressly entered its order under the authority of CR 35.01, not RCr 7.24(3)(B)(ii), and, as developed further below, we are of the opinion that RCr 7.24(3)(B)(ii) is inapplicable in this case. Thus, we must confine our analysis as to the availability of the writ to the trial court's actual order, which provided no *ex ante* protection of Appellant's Fifth Amendment rights.

Appellant claims that he has no adequate remedy by appeal because once he has been compelled to submit to the mental examination, any statements he has made cannot subsequently be unmade by an appellate court. In essence, Appellant claims that a mental examination will inevitably lead to Fifth Amendment violations, and that no appellate remedy is sufficient. While we note that there are traditional remedies for such violations, e.g., suppression of the offending statements, there is little guarantee that such remedies will be entirely effective in this case. Suppression is often employed after the fact, but it is an imperfect remedy; preventing the vio-

lation from occurring in the first place is preferable where possible. On this point, we have previously held that "[c]ompelling someone accused of a crime to submit against his or her will to a psychological examination could likely produce testimony, the effect of which could not be obliterated by appellate remedies." *Bishop v. Caudill,* 118 S.W.3d 159, 163 (Ky.2003). The nature of the potential constitutional violation in this setting requires more than an after-the-fact, ad hoc appellate fix. This is why, for example, in the one instance where our Criminal Rules expressly authorize a compelled mental examination by the prosecutor's expert, the rule also includes specific protections aimed at preserving the criminal defendant's rights. *See* RCr 7.24(3)(B)(ii) ("No statement made by the defendant in the course of any examination provided for by this rule, whether the examination be with or without the consent of the defendant, shall be admissible into evidence against the defendant in any criminal proceeding. No testimony by the expert based upon such statement, and no fruits of the statement shall be admissible into evidence against the defendant in any criminal proceeding except upon an issue regarding mental condition on which the defendant has introduced testimony.").

 The gravity of these concerns and the nature of the constitutional right involved lead us to the conclusion that the harm caused by the compelled mental examination satisfies the "great injustice and irreparable injury" prong required under the proceeding-erroneously writ standard. We have described "irreparable injury" in various ways, including "something of a ruinous nature," *Bender,* 343 S.W.2d at 801, and *"incalculable damage* to the applicant ... either to the liberty of his person, or to his property rights, or other far-reaching and conjectural conse-

quences." *Litteral v. Woods,* 223 Ky. 582, 4 S.W.2d 395, 397 (1928) (emphasis added). But this standard requires more than mere, or even great, injury. As our predecessor court noted:

> An impression has arisen that the mere loss of valuable rights or property through an error of the court constitutes great and irreparable injury entitling the loser automatically to relief from the error. However, a careful analysis of the cases dealing with the supervisory power of the Court ... under Section 110 of the Kentucky Constitution will disclose that in addition to the element of great and irreparable injury there must be some aspect of *injustice.* There must be something in the nature of usurpation or abuse of power by the lower court, such as to demand that the Court ... step in to maintain a proper control over the lower court. The object of the supervisory power of the Court ... is to prevent miscarriage of justice.

*Schaetzley v. Wright,* 271 S.W.2d 885, 886–87 (Ky.1954) (citations omitted). Forcing a criminal defendant to undergo a mental examination by an agent of the prosecution immediately brings up core Fifth Amendment concerns. This is what drove our decision in *Bishop,* where even though we did not engage in such explicit analysis of the availability of a writ, we nonetheless granted one. That decision was based, at least in part, on the danger that the Commonwealth would glean insights into defense strategies or would obtain a further confession from the defendant. Similarly, a compelled mental examination in these circumstances, ordered without any prospective protection for incriminating statements that such an examination might produce, presents such a large potential for abuse of a criminal defendant's Fifth Amendment rights that we must also conclude the great injustice and irreparable injury prong has been met.

Thus, Appellant, like the petitioner in *Bishop*, has met the prerequisites for the availability of the writ he seeks.

## B. Whether the Trial Court Erred

This, of course, leaves us to evaluate whether the trial court acted incorrectly, and, if so, whether the Court of Appeals abused its discretion by denying the writ. We begin by noting that the prosecutor and the Court of Appeals invoked RCr 7.24(3)(B)(ii) as justification for the trial court's action. The Commonwealth continues to press this argument on appeal. RCr 7.24(3)(B)(i) discusses the notice requirements where a defendant "intends to introduce expert testimony relating to a mental disease or defect or any other mental condition of the defendant bearing upon the issue of his or her guilt or punishment . . . ." In turn, RCr 7.24(3)(B)(ii) states:

> When a defendant has filed the notice required by paragraph (B)(i) of this rule, the court may, upon motion of the attorney for the Commonwealth, order the defendant to submit to a mental examination. No statement made by the defendant in the course of any examination provided for by this rule, whether the examination be with or without the consent of the defendant, shall be admissible into evidence against the defendant in any criminal proceeding. No testimony by the expert based upon such statement, and no fruits of the statement shall be admissible into evidence against the defendant in any criminal proceeding except upon an issue regarding mental condition on which the defendant has introduced testimony. If the examination ordered under this rule pertains to the issue of punishment (excluding a pretrial hearing under KRS 532.135), the court shall enter an order prohibiting disclosure to the attorneys for either party of any self-incriminating information divulged by the defendant until the defendant is found guilty of a felony offense, unless the parties otherwise enter into an agreement regulating disclosure.

The Court of Appeals' holding that RCr 7.24(3)(B)(ii) applies in this case because Appellant's mental status directly bears upon the issue of his guilt is simply incorrect. As Appellant has raised and framed the issue, his mental status goes only to whether the incriminatory statements he made should be suppressed at his trial. To read RCr 7.24(3)(B) in an expansive manner so as to include this dispute, as the Court of Appeals did in this case, would make the rule applicable to almost any criminal proceeding where a defendant's mental status is in question. But the rule clearly contemplates psychological evidence that is to be used during trial, for example, to prove a lack of guilt due to mental illness at the time of the crime or to show mitigating factors to reduce the punishment. In essence, the rule is applicable only when a defendant intends to offer evidence that directly bears on the issues of guilt or punishment, not in a situation such as this where evidence of the defendant's mental instability relates to whether other evidence is to be barred from trial and, therefore, has only a tangential bearing on guilt. Such evidence is significantly removed from any ultimate decision as to guilt or punishment—this is likely why the trial court based its order on CR 35.01 rather than RCr 7.24(3)(B)(ii).

Appellant, however, argues that CR 35.01 is inapplicable and claims that the only justification for the rule's application in a criminal case is the concurring opinion of a single justice in an earlier case. *See Bishop v. Caudill,* 118 S.W.3d 159, 165–167 (Ky.2003) (Keller, J., concurring) (arguing that CR 35.01 is applicable in criminal cases). This is simply incorrect. The *Bishop* majority did not address CR 35.01

because the issue in controversy in that case, whether the defendant was competent to stand trial, was expressly covered by a criminal rule. Moreover, Justice Keller was correct about the applicability of CR 35.01 to criminal proceedings. RCr 13.04 provides that "[t]he Rules of Civil Procedure shall be applicable in criminal proceedings to the extent not superseded by or inconsistent with these Rules of Criminal Procedure." Where there is no specific criminal rule addressing the availability (or non-availability) of a mental examination, as is the case here, RCr 13.04 would appear to require the application of Cr 35.01. Thus, as we have noted specifically in a recent case, "CR 35.01 ... is applicable to criminal proceedings by virtue of RCr 13.04...." *St. Clair v. Commonwealth*, 140 S.W.3d 510, 542 (Ky.2004).

Appellant argues that this interpretation conflicts with our holding in *Bishop v. Caudill*. *Bishop* involved a criminal defendant who challenged his competency to stand trial. The defendant moved for an examination to be paid for by the Commonwealth, presumably pursuant to RCr 8.06 and KRS 504.100, both of which require the trial court to appoint a mental health professional to examine any criminal defendant who the court has "reasonable grounds to believe" is incompetent to stand trial. Subsequently, the prosecution moved for a separate evaluation of the defendant by its own expert. The trial court granted this motion, and ordered the criminal defendant to submit to a separate mental examination by an agent of the Commonwealth. The defendant petitioned the Court of Appeals for a writ of prohibition, which was denied. We reversed on appeal.

In reversing, we focused on the fact that a compelled mental examination created far too great a risk, bordering on a certainty, that the defendant's Fifth Amendment rights would be violated. Though we have already quoted some of *Bishop*'s language on this point, it bears repeating, though with additional context:

> The policy reasons behind prohibiting the Commonwealth from obtaining its own competency evaluation are clear. Compelling someone accused of a crime to submit against his or her will to a psychological examination could likely produce testimony, the effect of which could not be obliterated by appellate remedies. That is, an unauthorized psychological examination by the Commonwealth's agent could result in the disclosure of prior conduct that would not otherwise be accessible to the prosecution. For example, the prosecution's mental health examiner may learn that a defendant engaged in the commission of crimes for which he had never been charged.

*Bishop*, 118 S.W.3d at 163. This language weighs heavily in favor of disallowing all separate mental examinations by the Commonwealth except those expressly allowed by RCr 7.24(3)(B)(ii).

However, *Bishop* ultimately took a subtler tack. We went to great pains to point out that "[t]he inquiry into a defendant's competency to stand trial is very different and distinct from an inquiry into whether the defendant is criminally responsible for the acts with which he is charged." *Id.* at 162. This is because a competency examination is initiated by the court, and "[a] competency examiner is working for the court, not necessarily the defense or the Commonwealth." *Id.* at 163. On the other hand, we noted that a "criminal responsibility evaluation, even if performed by the Commonwealth's examiner, is not a compelled examination as it is initiated by the defendant," *id.* at 164, and that because criminal responsibility is an issue for the jury to decide, "the Commonwealth

must have the right to rebut this position, a right which necessarily includes obtaining its own independent examination of the defendant." *Id.* Thus, we noted: "we are persuaded by the Legislature's plain inclusion of the Commonwealth's right to an independent examination when evidence of mental health at the time of the offense is to be introduced, and its plain exclusion of a similar right when only competency to stand trial is at issue."

While it is clear that the issue Appellant seeks to raise before the trial court— namely, the impact of his mental state on the voluntariness of his incriminating statements [1]—has no direct bearing on his guilt or punishment, it is equally clear that this issue is distinct from an inquiry into his competence to stand trial. In a sense, Appellant seeks to have the trial court make a factual determination as to whether he was competent to confess to the police, but unlike a determination as to his competence to stand trial, this is not an issue that the trial court is charged with raising, or even has the power to raise, independently. Thus, the specific issue Appellant is now raising is something of a hybrid issue, falling somewhere between competency to stand trial and criminal responsibility. Given the differences between the issue Appellant has raised and that presented in the competency setting, we conclude that *Bishop*, with its blanket prohibition on independent mental examinations by the Commonwealth in the course of trial competency determinations,

is of limited applicability outside that limited setting.

One aspect of this issue's similarity to criminal responsibility—that the defendant, rather than the trial court, raises this issue—requires that the Commonwealth have a chance to "rebut th[e] position. . . ." *Id.* at 164. Though this differs slightly from the dicta in *Bishop* that indicated that this right of rebuttal arises from the fact that criminal responsibility is a jury issue, it is not a significant departure from that case. The prosecution's right of rebuttal more properly derives from the fact that the issue in question is one that the defendant has raised. Though we often speak of fundamental fairness in trial procedures as a principle to protect a defendant's rights, the principle is no less applicable to the prosecution. Even if it is only an attempt at parity between the prosecution and the defense, fundamental fairness demands that a defendant's decision to place an issue in controversy subjects that claim to the rigors of the adversarial process. To hold otherwise would give criminal defendants a distinct and undeserved advantage when raising issues of mental health outside of the area of competency to stand trial.

The hybrid nature of Appellant's underlying claim is precisely why CR 35.01 is the applicable rule in this case. Neither the competency procedures, RCr 8.06 and KRS 504.100, nor the criminal responsibility procedures, RCr 7.24(3)(B), are a perfect fit. The trial court correctly per-

---

1. Though it is somewhat premature, given that Appellant so far appears to have focused solely on whether he was mentally ill when he made his incriminating statements, we note that the admissibility of those statements hinges on more than just a factual finding of mental illness. Although a defendant's mental health condition at the time of a confession is an important consideration, *see Blackburn v. Alabama*, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960), the primary factor in such a case is whether the police engaged in coercion. *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986) ("We hold that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment.").

ceived that the Appellant's claimed issue fell in this gap. While it may seem odd to some to apply a rule of civil procedure in a criminal case, in some situations, it is necessary. The criminal rules simply do not dictate the trial procedure to be followed in all cases. Whether this is due to inadvertent omission in some cases or an explicit refusal to enact a rule that merely repeats standard trial practice as provided in the civil rules is unimportant. What is clear, however, is that RCr 13.04 was clearly drafted with this gap-filling function in mind.

This is not to say, however, that the trial court's order in this case was not in error. The civil rules were not drafted with the complicating constitutional factors of criminal cases in mind. Not surprisingly, rote application of a civil rule to a criminal case like this one can have unintended consequences of a constitutional dimension as discussed above. The risk of a defendant revealing incriminating details or disclosing valuable defense strategies during a compelled mental examination is significantly increased over that inherent in the average police interrogation because such an examination is, by its nature, significantly more intrusive than police questioning. The mental examination authorized by CR 35.01 in the context of a criminal case will inevitably infringe on a criminal defendant's Fifth Amendment rights without some additional protection, yet the rule contains no default mechanism for safeguarding those rights. This is not surprising, since CR 35.01 is a *civil* rule. But to complicate matters, the trial court's order in this case also fails to provide prospective protection for Appellant's Fifth Amendment rights. Thus, we conclude that while the trial court had the authority to order Appellant to undergo a mental examination by the prosecution's expert, its order, as written, provides insufficient protection for Appellant's Fifth Amend-

ment rights. As such, the trial court's order, insofar as it failed to provide such protection, was in error.

The mere fact the CR 35.01 does not require prospective protection of a defendant's Fifth Amendment rights does not preclude the use of the civil rule in criminal cases. This option is unworkable because there is no clearly applicable criminal rule and because we are presented with a factual scenario that demands that the Commonwealth have an adequate opportunity to rebut assertions by the Defendant. Were we to hold CR 35.01 inapplicable, the gap in the criminal rules would still exist. That gap must be somehow filled—preferably by a stable, predictable rule that is already in place. CR 35.01 fits that bill. Nonetheless, where the application of a civil rule creates tension with—and possibly violation of—a constitutional guarantee, the civil rule cannot be applied blindly. Instead, it must be applied with an eye toward preserving the constitutional order, perhaps by requiring that the trial court exercise its discretion under the rule in a certain way or that additional protections be added whenever a civil rule is to be applied in a criminal case.

The easiest way to apply CR 35.01 in a fair manner is simply to impose on it the protective template from the criminal rule that it most resembles, RCr 7.24(3)(B)(ii). That rule reasonably restricts the scope and use of evidence obtained from the independent mental examination in a way that protects a defendant's privilege against self incrimination. Not only would such restrictions provide prospective protection for Appellant's Fifth Amendment rights, it would also allow him to retain his option not to use that evidence or further pursue the issue after the examinations had taken place. *See Bishop*, 118 S.W.3d at 164 ("Since the results of the Commonwealth's examination are admissible only to rebut the mental health evidence intro-

duced by the defense, Appellant can preclude introduction of the Commonwealth's evidence by declining to assert such evidence on his own behalf.").

We hesitate only slightly in this approach, because, as we noted in *Bishop*, prospective Fifth Amendment protections like those in RCr 7.24(3)(B)(ii) might not be sufficient. In the context of a mental examination "ordered against a defendant's wishes ... the Commonwealth would [still] gain the inherent and unfair advantage of gleaning insight as to the defense strategy." *Id.* However, we read that language as limited to the unique context of competency determinations, which the defendant has little ultimate control over instigating. This is especially true given that our concern in this area in *Bishop* was elevated by the defendant's active opposition to his trial attorneys. *Id.* at 163–64. Certainly the rule's protections are sufficient when criminal responsibility is at issue. Similarly, in the context of other potential compelled mental examinations, the overlay of the RCr 7.24(3)(B)(ii) protections provides the best balance between a defendant's constitutional rights and the basic demands of fairness toward the prosecution.

While we are cognizant of the Court of Appeals' broad discretion when considering a petition for a writ of prohibition, we think that the danger posed to Appellant's Fifth Amendment rights by the trial court's current order requires intervention. Therefore, the judgment of Court of Appeals is hereby reversed, and this matter is remanded and the Court of Appeals is instructed to enter a writ of prohibition in conformity with this opinion.

All concur.